# G. M. LEASING CORP. ET AL. v. UNITED STATES ET AL.

No. 75–235. Argued October 4, 1976—Decided January 12, 1977

*Richard J. Leedy* argued the cause and filed briefs for petitioners.

*Solicitor General Bork* argued the cause for the United States et al. With him on the brief were *Assistant Attorney General Crampton, Stuart A. Smith, Leonard J. Henzke, Jr.,* and *Stephen M. Gelber.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

We granted certiorari in this case, 423 U. S. 1031 (1975), limited to the Fourth Amendment issue arising in the context of seizures of property in partial satisfaction of income tax assessments.[1]

I

Petitioner G. M. Leasing Corp. is a Utah corporation organized in April 1972; among its stated business purposes is the leasing of automobiles. George I. Norman, Jr., although apparently not an incorporator, officer, or director of petitioner, was its general manager.

In 1971 Norman was tried and convicted in the United States District Court for the District of Colorado on two counts of aiding and abetting a misapplication of funds from a federally insured bank, in violation of 18 U. S. C. §§ 2 and 656. He was sentenced to two concurrent two-year terms of imprisonment. On appeal, his conviction was affirmed. *United States* v. *Cooper,* 464 F. 2d 648, 651–652 (CA10 1972). This Court denied certiorari. 409 U. S. 1107 (1973).

---

[1] The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Norman and his wife, on November 15, 1971,[2] filed a joint income tax Form 1040 for the calendar year 1970 on which, apart from their names, address, social security numbers, occupations, and dependents, they indicated only that their tax for that year, "[e]stimated," was $280,000. The sum of $289,800 was transmitted when the form was filed and was placed by the Internal Revenue Service in a suspense account for future credit. Apart from the naked figure of estimated tax, the return contained no information as to income or deductions. App. 94.

The Normans also sought and were granted an extension of time within which to file their return for the calendar year 1971. A check for $405,125 was given to the Service on April 15, 1972, for application on their 1971 tax. This check evidently was dishonored. Although further extensions of time were granted, neither of the Normans ever filed a 1971 return.

In October 1972, after Norman's conviction was affirmed by the Tenth Circuit, the Service assigned the Norman account for 1970 and 1971 to Agent P. J. Clayton for investigation. Mr. Clayton, however, took no immediate action. *Id.*, at 66; Tr. of Oral Arg. 24–25.

In March 1973, after Norman's petition for a writ of certiorari had been denied, and after his petition for rehearing had also been denied, 410 U. S. 959 (1973), he surrendered to the United States Marshal for the serving of his sentence. By a ruse, however, he immediately disappeared. Tr. of Oral Arg. 6. Norman thereupon became a fugitive from justice; he was still one at the time of the oral argument. App. 15; Brief for Petitioners 5; Tr. of Oral Arg. 5–6.

Upon Norman's becoming a fugitive, the Service activated its investigation. On March 19, it determined deficiencies in Norman's income tax liability for 1970 and 1971 in the

---

[2] Four extensions of time for filing had been granted. App. 99.

amounts of $406,099.34 and $545,310.59, respectively.[3] App. 95. These were based solely on information from third parties concerning the amount of stock sales Norman made through various brokerage houses. *Id.,* at 30, 67.[4] Because of Norman's failure to file appropriate returns and because of his fugitive status, collection of the taxes as so determined was regarded by the Service as in jeopardy; the deficiencies, therefore, were assessed forthwith pursuant to the authority granted by § 6861 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 6861 (a).[5]

The following day revenue agents called at the Norman residence in Salt Lake City to endeavor to collect the taxes.

---

[3] At the same time, the Service determined deficiencies in Mrs. Norman's income tax liability for 1970 and 1971 in the amounts of $69,265.04 and $84,873.50, respectively. *Id.,* at 96. Those deficiencies are not at issue in this case.

[4] Agent Clayton, called as a witness for the petitioner in the present case, on cross-examination answered "No" to the question whether he was "able to get any cooperation at all" from Mr. Norman. *Id.,* at 30. When later called as a witness on behalf of the respondents, Clayton also gave a negative answer to the question whether he had received "any information from the taxpayer or his accountant or representative." *Id.,* at 66.

Petitioner protests any adverse inference that might flow from this testimony and asserts that there is no evidence that Clayton requested assistance from Norman or his representatives who had filed powers of attorney with the Service. Reply Brief for Petitioners 3–4. Counsel for respondents at oral argument stated: "I want to correct any wrong implication if there is one, that they received no cooperation from Mr. Norman. . . . [N]obody had asked him prior to that time [his becoming a fugitive] for cooperation." Tr. of Oral Arg. 25.

[5] Jeopardy assessments of the determined deficiencies in Mrs. Norman's taxes were also made on March 19. App. 97.

The notice which is required after jeopardy assessment by § 6861 (b) of the Code enables the taxpayer to file a petition with the United States Tax Court for a redetermination of the deficiency. See *Laing* v. *United States,* 423 U. S. 161 (1976). A timely notice was sent to Norman, and a petition was filed on his behalf with the Tax Court. His case awaits trial there (Docket No. 6000–73).

Mrs. Norman answered the door. The agents informed her of the jeopardy assessments and demanded payment. No payment was forthcoming, and Mrs. Norman suggested that the agents get in touch with her attorney. App. 56. Thereafter, pursuant to their authority under § 6331 of the Code, the agents filed notice of tax liens with the Salt Lake County Recorder's Office and levied on a bank account of Norman. App. 95, 58.

While the agents were at the Norman residence, they observed automobiles parked in the driveway. Later, upon checking with the Utah Motor Vehicle Division, they learned that these vehicles were registered in the name of petitioner or in the name of another corporation owned by Norman, and that no automobile was registered in Norman's name or in that of his wife. *Id.*, at 73–74. They also learned that petitioner had no license to conduct business within Salt Lake County and had no telephone listing. *Id.*, at 74. It was further ascertained that, pursuant to the request of the Utah Department of Employment Security, petitioner had filed a Status Report. That report described the corporation's principal business activity as "Leasing Luxury Automobiles, Boats, etc." It recited that the corporation's "average number of employees" was zero and that it had paid no wages while it was in existence during the last three quarters of 1972 or thus far in 1973. *Id.*, at 91–92. On its Utah Sales and Use Tax Return for the second quarter of 1972, the corporation reported no sales. *Id.*, at 93. The agents regarded the automobiles seen at the Norman residence as "show" or "collector" cars and not the type "that would normally be used in a leasing business." *Id.*, at 74.

All these facts suggested to the agents that petitioner corporation was not engaged in any business activity but, instead, was Norman's alter ego and a repository of at least some of his personal assets. The agents consulted with the Service's Regional Counsel. With his concurrence,

the conclusion was drawn that the assets of the corporation actually belonged to Norman. Accordingly, the decision was made to levy upon and seize automobiles titled in petitioner's name in partial satisfaction of the assessments against Norman. *Id.*, at 75–76.

On or about March 21, two days after the jeopardy assessments, revenue officers, without a warrant, seized several automobiles. Among them were a 1972 Stutz, a Rolls Royce Phantom V, a 1930 Rolls Royce Phantom I, two 1971 Stutzes, and a Jaguar. Three were taken at two different locations in Salt Lake City; two at the Century Plaza parking lot in Los Angeles, Cal.; and one near Norman's residence in Salt Lake City. *Id.*, at 121, 129; Tr. of Oral Arg. 13–14. None of the cars was on property in which petitioner had an interest. All were registered in petitioner's name. App. 75–76. The officers left a Chevrolet and a station wagon for the personal use of Mrs. Norman and her family.[6] *Id.*, at 58.

Also on March 21, revenue officers went to petitioner's office in Salt Lake County to levy on property subject to seizure, including the building itself. *Id.*, at 19. They had information that one, and possibly two, luxury automobiles might be there. Upon learning that a car was in the garage on the premises, they telephoned their superior, Bert Applegate, and asked him to come out to assist. *Id.*, at 77–79. The premises consisted of a cottage-type building and the garage. When Applegate arrived, a locksmith was there. He already had removed the lock from the garage door

---

[6] The two automobiles seized in Los Angeles were a two-door tan Stutz, valued at $30,000, and a four-door burgundy Stutz, valued at $100,000. They were financed by loans from Murray First Thrift. Following the levy, Murray foreclosed its own liens and arranged with Norman's attorney for the sale of the automobiles. App. 33, 122. It appears that the Government did not participate in those transactions and received no portion of the proceeds of the sales.

at the direction of the officers. A Stutz automobile was inside. The locksmith also had removed the lock on the cottage's rear door. *Id.*, at 80–81.

Applegate entered the cottage. He observed that its outward appearance was such that it could be a residence. He noticed a kitchen. He instructed the officers not to proceed with the seizure of any property there until the status of the cottage could be confirmed.[7] *Id.*, at 81, 23–24. The officers then left the cottage without taking anything, and its lock was replaced. *Id.*, at 82.

While the officers were in the cottage, Norman's son, George I. Norman III, age 19, and listed as a dependent on the 1970 Form 1040, appeared. He told the officers that the Stutz belonged to the petitioner corporation, and not to Norman. *Id.*, at 80, 34. He testified that he was living at the cottage "as security." *Id.*, at 34. He was asked to provide evidence as to the car's ownership. A decision was made not to seize the automobile at that time.

Information then came to Applegate, primarily from a Mr. Redd who was a contractor for Norman, that the cottage was a place of business and not a residence. *Id.*, at 79. In addition, there was activity at the cottage that night; the lights were on and boxes were being moved. The next morning the Stutz was not in the garage.[8] *Id.*, at 83. Sometime during the next two days, a decision was made to seize the cottage, its furnishings and any other assets there.[9] On

---

[7] The Internal Revenue Service Manual, ¶ 5341.1, instructs that if an occupant of a private residence denies a revenue officer permission to enter, the officer should not attempt entry by force.

[8] The Service later found this particular automobile at another location. App. 83. It had been moved by Norman's son after the revenue agents had left on March 21. *Id.*, at 34.

[9] Title to the cottage was in the name of Real Estate, Inc., a corporation the Service determined to be the alter ego of Mrs. Norman. *Id.*, at 97. That corporation is not a party to the present suit and the relief petitioner requests does not include the return of the cottage.

March 23,[10] agents, acting without a warrant, and with the assistance of locksmiths and the equipment of a private van and storage firm, entered the cottage and removed its remaining contents, including furnishings and books and records. An inventory was made of the property so seized. The agents hoped to examine the books and records to see if they contained stock certificates or information concerning the location of other assets. The Regional Counsel, however, instructed them to pack the books and records, seal the boxes, and remove them to a safe storage place. *Id.*, at 83–88.

In May, petitioner corporation instituted this suit. By its amended complaint it asserted a claim for wrongful levy, with a request for the return of the automobiles; a claim for suppression of all evidence obtained from the seized documents; and a claim against the agents for damages. *Id.*, at 105–112. It alleged that the assessments were arbitrary and capricious, that petitioner was not an alter ego of Norman, and that the levy upon its premises and the contents violated the Fourth Amendment. *Ibid.*

Shortly thereafter, the Service returned to the cottage the originals of the records and documents that had been seized. In the meantime, however, they had been photocopied.[11] By a second amendment to petitioner's complaint, *id.*, at 124, punitive damages, among other relief, were requested.

Norman's son filed a complaint in intervention, *id.*, at 112–117, alleging essentially the same facts and requesting

---

[10] There is some evidence in the record that this took place on March 22 rather than March 23. *Id.*, at 34, 59, 77.

[11] The respondents in their brief state that while the case was pending on appeal to the Tenth Circuit the Service voluntarily destroyed all existing photocopies of the seized books and records. Brief for Respondents 16 n. 9, 76–77, and n. 43. Petitioner concedes that the seized documents have been returned and the photocopies destroyed. Tr. of Oral Arg. 14–15.

similar relief. The District Court allowed his intervention. The Government then filed a counterclaim seeking foreclosure of the tax liens against the property held in petitioner's name. *Id.,* at 127–134.

At the ensuing trial before the court without a jury there was testimony that Norman himself originally held title to some of the automobiles registered in petitioner's name, *id.,* at 37; that petitioner had no employees and did not lease any cars, *id.,* at 37, 39; that petitioner's only assets were luxury or vintage model automobiles; that the cars had not been transferred to it until at or near the end of 1972; and that petitioner never issued any stock, held any director's meetings, or engaged in any business.[12] *Id.,* at 43–45.

The District Court entered judgment for petitioner and for the intervenor. It found that the premises in question were the offices of petitioner and the residence of the intervenor; that the revenue-officer defendants had no search warrant; that they forcibly entered the premises on March 23 and again on March 25;[13] that they made the entry, search, and seizure "knowing full well that they were violating the rights" of petitioner, the intervenor, "and others"; that Agent Clayton committed the entry "maliciously"; that the defendants returned the books and records that had been seized but photocopied them and retained the photocopies; that the defendants levied upon and seized all the assets of petitioner, including seven automobiles and a bank account; that they disposed of two of the automobiles and stored the others in Salt Lake City; that the assessments of taxes, penalties, and interest against Norman and his wife for 1970 and 1971 were erroneous; that Norman and his wife had no liability for federal income tax, penalties,

---

[12] There was conflicting testimony as to whether stock was issued. 1 Tr. 52–53.

[13] This date appears to be an error. See also n. 10, *supra.*

or interest for those years; that petitioner had "engaged in substantial business activity in preparation for its business purpose of leasing automobiles"; that it was not controlled solely by Norman or his wife; that it was not an alter ego of Norman or his wife; and that it was not their nominee. The court concluded that the revenue-officer defendants committed an illegal search and seizure of petitioner's offices and the intervenor's residence, in violation of the Fourth Amendment; that the photocopies of the seized books and records in the possession of the Service should be destroyed because any use of them would be illegal; that petitioner and the intervenor were entitled to general and punitive damages in amounts to be determined; that the Government's counterclaim should be dismissed with prejudice; that the Service should return all the seized assets of petitioner and of the intervenor; and that judgment should be awarded against the United States in favor of petitioner for the value of the two automobiles that had been sold. *Id.*, at 136–142. Judgment, including injunctive relief for the return of the automobiles and the books and records, and for the destruction of the photocopies, was entered accordingly. *Id.*, at 142–144.

The Court of Appeals, for the most part, reversed. 514 F. 2d 935 (CA10 1975). It ruled that the evidence conclusively established that petitioner was Norman's alter ego so that its assets could be seized to satisfy Norman's income tax liability; that the District Court's finding to the contrary was clearly erroneous; that petitioner had not sustained its burden of proving the assessments to be erroneous; and that the trial court erred in invalidating the assessments and in dismissing the Government's counterclaim. In regard to the claim of illegal search and seizures, the Court of Appeals held:

> "The refusal to pay authorized appellants to collect the tax by levy, and this included the power of 'seizure by any means.' Thus appellants were acting pursuant to

statute and did not commit an illegal search. The trial court's order returning the assets and suppressing the documents is improper." (Footnote omitted.) *Id.,* at 941.

The court also ruled that there was no evidence to support the trial court's finding that Clayton's participation "was of a malicious character." *Ibid.* In accord with a concession by the Government, the Court of Appeals affirmed the trial court's judgment insofar as it ordered the return of certain shares of stock to the intervenor.[14]

## II

A. Section 6331 (a) of the 1954 Code authorizes the Secretary or his delegate to collect taxes "by levy upon all property and rights to property" belonging to a person who "neglects or refuses to pay" any tax "or on which there is a lien . . . for the payment of such tax."[15] Section 6331 (b),

---

[14] This portion of the judgment of the Court of Appeals affirming the trial court is not before us. Neither is any right of the intervenor at issue here. Tr. of Oral Arg. 13.

[15] Section 6331 reads in part:

"(a) Authority of Secretary or delegate.

"If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax. . . . If the Secretary or his delegate makes a finding that the collection of such tax is in jeopardy, notice and demand for immediate payment of such tax may be made by the Secretary or his delegate and, upon failure or refusal to pay such tax, collection thereof by levy shall be lawful without regard to the 10-day period provided in this section.

"(b) Seizure and sale of property.

"The term 'levy' as used in this title includes the power of distraint and seizure by any means. A levy shall extend only to property pos-

and § 7701 (a)(21) as well, define "levy" as including "the power of distraint and seizure by any means." Both real estate and personal property, tangible and intangible, are subject to levy. Levy upon tangible property normally is effected by service of forms of levy or notice of levy and physical seizure of the property. Where that is not feasible, the property is posted or tagged. Because intangible property is not susceptible of physical seizure, posting, or tagging, levy upon it is effected by serving the appropriate form upon the party holding the property or rights to property. See Treas. Reg. § 301.6331–1 (a)(1), 26 CFR § 301.6331–1 (a)(1) (1976). See also *Phelps* v. *United States,* 421 U. S. 330, 335–337 (1975). And the Court has recognized that compulsion on the part of the Service occasionally is required in the enforcement of the revenue laws. See *United States* v. *Bisceglia,* 420 U. S. 141, 145 (1975). Indeed, one may readily acknowledge that the existence of the levy power is an essential part of our self-assessment tax system and that it enhances voluntary compliance in the collection of taxes that this Court has described as "the life-blood of government, and their prompt and certain availability an imperious need." *Bull* v. *United States,* 295 U. S. 247, 259 (1935).

Under § 6321 of the Code,[16] the assessments against Norman were a lien in favor of the United States upon all property

---

sessed and obligations existing at the time thereof. In any case in which the Secretary or his delegate may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible)."

[16] Section 6321 reads:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

belonging to Norman. If petitioner was Norman's alter ego, it had no countervailing effect for purposes of his federal income tax. *Griffiths* v. *Commissioner,* 308 U. S. 355 (1939); *Higgins* v. *Smith,* 308 U. S. 473, 476 (1940). It would then follow that the Service could properly regard petitioner's assets as Norman's property subject to the lien under § 6321, and the Service would be empowered, under § 6331, to levy upon assets held in petitioner's name in satisfaction of Norman's income tax liability. See *United States* v. *Plastic Electro-Finishing Corp.,* 313 F. Supp. 330, 333–334 (EDNY 1970), aff'd, 71–1 USTC ¶ 9421 (CA2 1971).

B. Our grant of certiorari was limited to the Fourth Amendment issue, and we declined to review petitioner's and Norman's son's claims that the assessments and levies should have been voided and that petitioner was not Norman's alter ego. Pet. for Cert. 2, 3.[17] We therefore approach this case accepting the Court of Appeals' determinations that the assessments and levies were valid and that petitioner was Norman's alter ego. Those facts necessarily establish probable cause to believe that assets held by petitioner were properly subject to seizure in satisfaction of the assessments. Petitioner does not claim that there was no probable cause to believe that the automobiles were held by petitioner, nor does it claim that there was no probable cause to believe that its offices would contain other seizable goods. There being probable cause for the search and seizures, the only questions before the Court are whether warrants were required to make "reasonable" either the seizures of the cars or the entry into and seizure of goods in the cottage.

C. The seizures of the automobiles in this case took place on public streets, parking lots, or other open places, and did not involve any invasion of privacy. In *Murray's Lessee* v.

---

[17] This effectuated a denial of the son's petition for certiorari.

*Hoboken Land & Improv. Co.*, 18 How. 272 (1856), this Court held that a judicial warrant is not required for the seizure of a debtor's land in satisfaction of a claim of the United States. The seizure in *Murray's Lessee* was made through a transfer of title which did not involve an invasion of privacy. The warrantless seizures of the automobiles in this case are governed by the same principles and therefore were not unconstitutional. See also *Hester* v. *United States*, 265 U. S. 57 (1924) (liquor seized in open field).[18]

D. The seizure of the books and records, however, involved intrusion into the privacy of petitioner's offices. Significantly, the Court has said:

"[O]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search

---

[18] If additional support were needed for this result, it is found in the Court's decisions sustaining the right of the Government to collect taxes by summary administrative proceedings. Thus, in *Bull* v. *United States*, 295 U. S. 247, 260 (1935), it was stated that a tax assessment "is given the force of a judgment, and if the amount assessed is not paid when due, administrative officials may seize the debtor's property to satisfy the debt." See also *Cheatham* v. *United States*, 92 U. S. 85, 87–90 (1876); *State Railroad Tax Cases*, 92 U. S. 575, 612–615 (1876); *Graham* v. *Du Pont*, 262 U. S. 234, 255 (1923). The rationale underlying these decisions, of course, is that the very existence of government depends upon the prompt collection of the revenues. In *Phillips* v. *Commissioner*, 283 U. S. 589, 596–597 (1931), the Court rejected a constitutional challenge to the statutory system under which taxes may be collected summarily without a pre-seizure judicial hearing. It was held that as long as there was an adequate opportunity for a post-seizure determination of the taxpayer's rights, the statute met the requirements of due process. See *Commissioner* v. *Shapiro*, 424 U. S. 614, 630–633 (1976); *Fuentes* v. *Shevin*, 407 U. S. 67, 91–92 (1972). These cases, of course, center upon the Due Process Clause rather than the Fourth Amendment, but the constitutional analysis is similar and yields a like result. It is to be noted that the Court in *Phillips*, 283 U. S., at 596, cited *Murray's Lessee* with approval as a case which sustained proceedings "more summary in character" and "involving less directly the obligation of the taxpayer."

of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court*, 387 U. S. 523, 528–529 (1967).

See *Coolidge* v. *New Hampshire*, 403 U. S. 443, 454–455 (1971); *id.*, at 512 (WHITE, J., concurring and dissenting); *Stoner* v. *California*, 376 U. S. 483 (1964); *United States* v. *Jeffers*, 342 U. S. 48 (1951); *McDonald* v. *United States*, 335 U. S. 451 (1948); *Agnello* v. *United States*, 269 U. S. 20 (1925).

The respondents do not contend that business premises are not protected by the Fourth Amendment. Such a proposition could not be defended in light of this Court's clear holdings to the contrary. *See* v. *City of Seattle*, 387 U. S. 541 (1967); *Go-Bart Co.* v. *United States*, 282 U. S. 344 (1931); *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385 (1920). Nor can it be claimed that corporations are without some Fourth Amendment rights. *Go-Bart Co.* v. *United States, supra; Silverthorne Lumber Co.* v. *United States, supra; Oklahoma Press Pub. Co.* v. *Walling*, 327 U. S. 186, 205–206 (1946); *Hale* v. *Henkel*, 201 U. S. 43, 75–76 (1906). Cf. *California Bankers Assn.* v. *Shultz*, 416 U. S. 21 (1974); *Federal Trade Comm'n* v. *American Tobacco Co.*, 264 U. S. 298, 305–306 (1924); *Wilson* v. *United States*, 221 U. S. 361, 375–376 (1911); *Consolidated Rendering Co.* v. *Vermont*, 207 U. S. 541, 553–554 (1908).

The Court, of course, has recognized that a business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context. Thus, in *United States* v. *Biswell*, 406 U. S. 311 (1972), a warrantless search of a locked storeroom during business hours, pursuant to the inspection procedure authorized by the Gun Control Act of 1968, 18 U. S. C. § 923 (g), was upheld:

"When a dealer chooses to engage in this pervasively

regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." 406 U. S., at 316.

See also *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970) (Congress has broad authority to fashion standards of reasonableness for searches and seizures to regulate the liquor industry but failed in that case to authorize a warrantless search).

In the present case, however, the intrusion into petitioner's privacy was not based on the nature of its business, its license, or any regulation of its activities. Rather, the intrusion is claimed to be justified on the ground that petitioner's assets were seizable to satisfy tax assessments. This involves nothing more than the normal enforcement of the tax laws, and we find no justification for treating petitioner differently in these circumstances simply because it is a corporation.

The respondents argue that there is a broad exception to the Fourth Amendment that allows warrantless intrusions into privacy in the furtherance of enforcement of the tax laws. We recognize that the "Power to lay and collect Taxes" is a specifically enunciated power of the Federal Government, Const., Art. I, § 8, cl. 1, and that the First Congress, which proposed the adoption of the Bill of Rights, also provided that certain taxes could be "levied by distress and sale of goods of the person or persons refusing or neglecting to pay." Act of Mar. 3, 1791, c. 15, § 23, 1 Stat. 204. This, however, relates to warrantless seizures rather than to warrantless searches. It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer.

Indeed, one of the primary evils intended to be eliminated by the Fourth Amendment was the massive intrusion on privacy undertaken in the collection of taxes pursuant to general warrants and writs of assistance.[19] As Madison argued, urging the adoption of a Bill of Rights to restrain the Federal Government:

"The General Government has a right to pass all laws which shall be necessary to collect its revenue; the means for enforcing the collection are within the direction of the Legislature: may not general warrants be considered necessary for this purpose, as well as for some purposes which it was supposed at the framing of their constitutions the State Governments had in view? If there was reason for restraining the State Governments from exercising this power, there is like reason for restraining the Federal Government." 1 Annals of Cong. 438 (1834 ed.).

The respondents urge that the history of the common law in England and the laws in several States prior to the adoption of the Bill of Rights support the view that the Fourth Amendment was not intended to cover intrusions into privacy in the enforcement of the tax laws. We do not find in the cited materials anything approaching the clear evidence that would be required to create so great an exception to the Fourth Amendment's protections against warrantless intrusions into privacy.

The respondents also rely upon certain dicta in *Boyd* v. *United States,* 116 U. S. 616 (1886) [20] (subpoena of private

---

[19] See T. Taylor, Two Studies in Constitutional Interpretation 41 (1969); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51–78 (1937); J. Landynski, Search and Seizure and the Supreme Court 30–42 (1966).

[20] In *Boyd,* the Court stated:

"The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different

papers impermissible). But see *Fisher* v. *United States,* 425 U. S. 391, 408–411 (1976), and *Andresen* v. *Maryland,* 427 U. S. 463, 471–472 (1976). We do not find in *Boyd* any direct holding that the warrant protections of the Fourth Amendment do not apply to invasions of privacy in furtherance of tax collection. Insofar as language in *Boyd* might be read so to state, we decline to follow those dicta into rejection of the basic governing principle that has shaped Fourth Amendment law.

Finally, the respondents argue that warrantless searches are justified by congressional enactment, as were the searches in *Biswell* and *Colonnade.* The statute, § 6331 (b) of the Code, 26 U. S. C. § 6331 (b), authorizes "distraint and seizure by any means." See n. 15, *supra.* Read narrowly, it au-

---

things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him." 116 U. S., at 623.

The Court's concern in *Boyd* was with establishing the impermissibility of the subpoena of papers. It was not concerned with the warrant requirement for entry into private places. The Court, however, did say:

"The entry upon premises, made by a sheriff or other officer of the law, for the purpose of seizing goods and chattels *by virtue of a judicial writ,* such as an attachment, a sequestration, or an execution, is not within the prohibition of the Fourth or Fifth Amendment, or any other clause of the Constitution." *Id.,* at 624 (emphasis added).

The Court was not concerned with, and therefore did not explain, whether the "judicial writ" referred to above was necessary in order to meet the warrant requirements. The opinion does describe the "obnoxious writs of assistance" against which the Fourth Amendment was designed to protect. This description gives an indication of the types of tax-enforcement actions that the Amendment's protections were intended to reach:

"Even the act under which the obnoxious writs of assistance were issued did not go as far as this, but only authorized the examination of ships and vessels, and persons found therein, for the purpose of finding goods prohibited to be imported or exported, or on which the duties were not paid, and to enter into and search any suspected vaults, cellars, or warehouses for such goods." (Footnote omitted.) *Id.,* at 623.

thorizes the use of every means to deprive the taxpayer of use, enjoyment, or title to property (*e. g.*, transferring title, asportation, immobilization). It does not refer to warrantless intrusions into privacy. The respondents, however, would have us read the statute to authorize such warrantless intrusions. They assert that a statute of that kind is permissible in light of the considerations discussed in *Camara* and *See*. Examination of the statute shows that quite the opposite is true.

The respondents recognize that one of the Court's critical concerns in *Camara* and *See* was the discretion of the seizing officers. Brief for Respondents 66. Yet § 6331 clearly gives the Secretary or his delegate discretion as to what property to seize. If more than one location is involved, the Secretary will choose which dwelling will be invaded. If property is to be found both in public places and in private areas, the Secretary may choose which to seize. This hardly can be called a restraint on discretion. The respondents also recognize the concern with the existence of questions of disputed fact. They argue that in the seizure situation there are no such questions; yet in the present case the agents' confusion over whether the premises were an office or a residence demonstrates the contrary.

The respondents assert that the burden on the Government of obtaining a warrant is a relevant factor. Brief for Respondents 67–68. They suggest that the burden is great here because the Government is dealing with persons who may attempt to put their property beyond reach. Yet the statute authorizes distraint and seizure whenever a taxpayer *neglects* or refuses to pay his tax, and regardless of any indication of risk of concealment. The statute simply does not focus on situations involving a need for rapid action.

The respondents argue that the interest in the collection of taxes is such as to bring this case within the reasoning of *Biswell* and *Colonnade*. Those cases involved voluntary

participation in a highly regulated activity. Section 6331, however, covers all defaults on all taxes, and we are unwilling to hold that the mere interest in the collection of taxes is sufficient to justify a statute declaring *per se* exempt from the warrant requirement every intrusion into privacy made in furtherance of any tax seizure.

The respondents suggest that the privacy interest in business premises is less than that in a private home. Even if correct, the assertion is irrelevant with respect to the intent of the statute, for the statute makes no distinction between business properties and dwelling areas. If it authorizes entries at all, it authorizes entries into both business premises and private homes.

The respondents offer no legislative history in support of their reading of § 6331, and to give the statute that reading would call its constitutionality into serious question. We therefore decline to read it as giving *carte blanche* for warrantless invasions of privacy. Rather, we give it its natural reading, namely, as an authorization for all forms of *seizure,* but as silent on the subject of intrusions into privacy.

The intrusion into petitioner's office is therefore governed by the normal Fourth Amendment rule that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court,* 387 U. S., at 528–529.

As an alternative to their argument that a new exception to the warrant requirement should be recognized, the respondents assert that the facts of this case bring it within the "exigent circumstances" exception to the warrant requirement.[21] The agents' own actions, however, in their

---

[21] There is no claim that any other exception to the warrant requirement, such as "hot pursuit," "plain view," or "pursuant to an arrest," is applicable here.

delay for two days following their first entry, and for more than one day following the observation of materials being moved from the office, before they made the entry during which they seized the records, are sufficient to support the District Court's implicit finding that there were no exigent circumstances in this case.

We therefore conclude that the warrantless entry into petitioner's office was in violation of the commands of the Fourth Amendment.

### III

This takes us to the issue of remedy. Specifically, petitioner, by its second amended complaint, prayed for (a) the return of the photocopies of the books and records; (b) the return of the automobiles; (c) a declaration that petitioner is not the alter ego of Norman or of Mrs. Norman; (d) the suppression of all evidence obtained from the books and records; (e) the suppression of the automobiles as evidence; (f) the release of all levies; and (g) general and punitive damages against the individual defendant-agents. App. 123–124.

The alter ego issue, as has been noted, was denied review. The books and records were returned, and the photocopies concededly have been destroyed; that claim, thus, is moot. We have decided the issue of the legality of the seizure of the automobiles adversely to petitioner. The suppression issue, as to the books and records, obviously is premature and may be considered if and when proceedings arise in which the Government seeks to use the documents or information obtained from them. See *Meister* v. *United States,* 397 F. 2d 268, 269 (CA3 1968); *Hill* v. *United States,* 346 F. 2d 175 (CA9), cert. denied, 382 U. S. 956 (1965). And the irreparable injury required to support a motion to suppress, under Fed. Rule Crim. Proc. 41 (e), on equitable grounds in advance of any proceedings, has not been dem-

onstrated. *Hunsucker* v. *Phinney,* 497 F. 2d 29, 34 (CA5 1974), cert. denied, 420 U. S. 927 (1975).

This leaves only the issue of damages against the individual agents. The District Court found that Agent Clayton "maliciously committed said forced entry, and search and seizure," App. 138, and concluded that he and other individual defendants acted "knowing full well that they were violating the rights of" petitioner. *Ibid.* It concluded that petitioner was entitled to judgment for those actions. The Court of Appeals, in the context of its holding that the entry and search were not illegal, ruled that the finding of maliciousness on the part of Clayton was unsupported by any evidence in the record and was clearly erroneous. 514 F. 2d, at 940–941. It also reversed the judgment awarding petitioner damages. *Id.,* at 942.

We have held above, however, that a warrant should have been obtained, under the circumstances of this case, before the forcible entry was effected. This brings into focus and for consideration this Court's decision in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), and the reservation there of the immunity question. The Government suggests that, assuming a violation of the Fourth Amendment by the agents, petitioner is not entitled to money damages if the agents acted in good faith; that good faith was supported by the "apparent fact" that the agents' conduct was in conformity with standard Service procedures based upon *Murray's Lessee, supra;* and that the record justifies the conclusion that the agents acted in good faith. That may well be, but we conclude that this aspect of the facts, the existence of proof of any injury to petitioner resulting from the entry and the temporary seizure of the books and records, and the immunity issue all should be addressed in the first instance by the Court of Appeals and, if it so directs, by the District Court.

The judgment of the Court of Appeals is therefore affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

While I concur in the opinion of the Court, it may be useful to note that the factual setting of this case provides what seems, to me, a classic illustration of the dividing line between an impermissible, warrantless entry and one permissible under the "exigent circumstances" exception to the Fourth Amendment warrant requirement.

After their initial entry into, and retreat from, the petitioner's office-cottage, the IRS agents assigned to the investigation of the fugitive Norman's tax liability placed the premises under 24-hour surveillance. One night during the course of this surveillance, the agents observed cartons and other materials being removed from the premises by persons unknown to them. Against the background facts, such surreptitious nighttime activity constituted an exigent circumstance that would have justified an *immediate* seizure of the materials being moved in order to protect the interests of the United States. This is especially so since here the premises were controlled by the alter ego of an individual who was not only a delinquent taxpayer, but who was, at the time, a fugitive from justice. Rather than acting immediately, however, the agents chose to wait for approximately a day and a half to two days before making their entry. I agree with the conclusion that there were no exigent circumstances on these facts; however, the Court holds no more than that the agents' *delay* after observing these highly suspicious events makes that exception to the warrant requirement unavailable to them. By failing to act at once, the exigency was dissipated, and I do not understand our

opinion to imply, in any way, that the removal of cartons, which could reasonably have contained relevant records needed by the Government, would not have been an exigent circumstance permitting immediate seizure without the warrant required by the Fourth Amendment.