United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 31, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-51031

UNITED STATES OF AMERICA,

Respondent-Appellant,

versus

IN RE: SEARCH OF LAW OFFICE, RESIDENCE, AND STORAGE UNIT ALAN BROWN; LAW OFFICES OF BROWN AND NORTON,

Petitioners-Appellees.

Appeal from the United States District Court
For the Western District of Texas

Before KING, Chief Judge, and HIGGINBOTHAM and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The federal government appeals from the district court's order issued pursuant to Federal Rule of Criminal Procedure 41(e) requiring the government to return documents seized from the law offices and home of Alan Brown, a San Antonio, Texas criminal defense attorney. The government argues that the district court erred in concluding under Rule 41(e) that Brown[1] should recover his property and that the government should make no use of it. We find

---

[1] The Rule 41(e) motion was brought by Brown and his law offices. Collectively we will refer to both as "Brown."

that Brown showed no irreparable injury warranting the district court's pre-indictment suppression of the records, and therefore vacate the district court's order and remand with instructions to dismiss this proceeding.

**I.**

This case concerns the intertwined investigations of two individuals, Brown and his long-time office manager, Kelly Houston. In the mid-1990s federal agents began investigating Brown's client, Sammy Naranjo, for drug trafficking. In 1997 this investigation led agents to suspect that Houston, who was having an affair with Naranjo, was laundering money for him using Brown's law firm accounts. Part of the investigation included wiretaps, and the agents intercepted telephone conversations between Houston and Naranjo. On September 17, 1997, agents, including Special Agent James Maxwell of the Internal Revenue Service, arrived at Brown's office to deliver notices of intercept to Brown, on behalf of his client, Naranjo, and to Houston, to inform them that the government had intercepted their communications. Brown, Maxwell, and the other agent present discussed Houston's affair with Naranjo, and subsequent to this first meeting Brown, whom agents did not suspect was involved in Houston's alleged money laundering, agreed to cooperate with the agents in their investigation. Around that time Houston resigned from Brown's office because he instructed her that she could not continue working for him as long as she was in a

relationship with Naranjo. Sometime before Houston left the office she took with her various financial records detailing the office's receipt of monies. Although the Assistant United States Attorney assigned to the case, Tom McHugh, requested in a letter to Houston that she return these records, she denied having them.

As part of his cooperation with government agents, Brown allowed the agents complete access to his office and staff members, who provided the agents with information on how financial records were kept at the office. Pursuant to their request he also conducted, at his own expense, an audit of his office's financial records, and in February 1998 Brown testified before the grand jury as to the investigation into Houston's activities.

That same month the grand jury indicted Naranjo on various drug trafficking and money laundering charges. Although Maxwell and the other agents involved in the investigation of Houston believed that she should also be indicted, McHugh declined to prosecute because, at the time, he did not believe the agents had gathered enough evidence to secure a conviction. He did leave open the possibility, however, that if the agents gathered the evidence McHugh believed was lacking he would reconsider prosecution.

Naranjo's case was set for trial in October 1999. Brown was listed as a government witness, and Naranjo threatened Brown's life. Prior to his trial Naranjo also suggested to the same agents who had investigated him and Houston that Houston could give them information about illegal activities being committed by Brown.

-3-

Agents invited Houston to talk with them, and she did. Four days into his trial, Naranjo pleaded guilty, and Houston requested that, in return for her cooperation, Naranjo's sentence be reduced. In her discussions with the agents Houston stated that, for many years, Brown had been committing tax evasion by failing to report significant amounts of income he received in his practice. She provided the agents with the financial records she had taken from Brown's law office before her departure, and alleged that they proved that he had underreported income noted as received by him in the records.

In the summer of 2000 agents believed they had enough information regarding Brown's tax evasion to search Brown's office and home. On August 22, 2000, Agent Maxwell authored a forty-one page affidavit detailing Houston's allegations[2] and evidence corroborating that information. On the basis of the affidavit the magistrate judge issued a warrant authorizing a search of Brown's office and home, which agents executed the night of August 22 and early morning of August 23. Additionally, on August 23 Brown consented to the agents' request to search two storage units rented by his law office. Pursuant to procedures outlined in Maxwell's affidavit, a "taint team" composed of agents and attorneys separate from the team of agents investigating Brown conducted the search to

_____

[2] Although in the affidavit Maxwell did not identify Houston as the confidential informant supplying him with this information, since that time Houston's identity as the confidential informant has been made public.

protect any potentially privileged information contained in the records searched. The affidavit also provided that after the seizure the taint agents would maintain the records, which would be made available to Brown or his staff. During this time Brown could identify any potentially privileged records and attempt to resolve the privilege issues with the taint attorneys. If the issues could not be resolved they would be submitted to a court for determination.

Brown refused to participate in this privilege procedure, so the government determined that the taint attorneys would have to sift through the records themselves to divide those privileged items from the nonprivileged ones. After this process had begun Brown moved for a protective order, arguing that his counsel and the government had agreed that the taint team would not look through the records until a court had determined the proper procedure to be employed to resolve the privilege issues. Brown also requested that the court order the seized property returned pursuant to Federal Rule of Criminal Procedure 41(e) on the basis that it was illegally seized and that it contained privileged information.

The district court issued a protective order and determined that Brown's motion for return of property merited an evidentiary hearing. Over a year after Brown filed his motion for return of property, the court held a three-day hearing that focused almost exclusively on the factual basis for Maxwell's affidavit in support

of the search warrant application. Specifically, Brown argued that Maxwell had omitted and misrepresented several material facts that, had they been revealed to the magistrate judge at the time he was considering the application, he would not have issued the search warrant.

Nine months after the hearing, after prompting by the government, the district court issued its order granting Brown's motion. It concluded that Maxwell had failed to state in the affidavit that Houston cooperated with government agents to secure a reduced sentence for her paramour Naranjo, who had threatened Brown's life and against whom Brown was set to testify in the criminal trial, and that Maxwell had also omitted that Houston was likely cooperating to retaliate against Brown for cooperating with government agents in the investigation of her alleged money laundering activities.

The district court additionally determined that Maxwell should have revealed that he had investigated Houston for money laundering involving the same financial accounts at issue with regard to Brown's tax evasion, and that Maxwell believed she had indeed committed the offense despite the fact she was never prosecuted for it. Moreover, the district court found important that Houston had lied to McHugh about her possession of the firm's financial records, and that Maxwell had stated in his affidavit, contrary to this truth, that he was not aware of any false information Houston provided to law enforcement officers.

-6-

Finally, the district court concluded that Maxwell had misrepresented the nature of the receipt books, which Maxwell averred in the affidavit corroborated Houston's allegations. Maxwell had explained that the receipt books contained more notations regarding receipt of monies than Brown had reported on his tax returns, but the district court found that the evidence showed that the receipt books included notations of many different payments that did not constitute income, but rather court fees, fees to other attorneys, and restitution amounts.

Based on these findings the district court concluded that Brown was entitled to all of the seized property and the government should not be allowed to retain copies or make any use of the evidence, which effectively suppressed the evidence from consideration by the grand jury as well as in any post-indictment proceedings. The government appeals this ruling. Although at the time of the filing of this appeal Brown had no criminal charges pending against him, in April of this year the grand jury indicted Brown on certain tax fraud charges.

## II.

Rule 41(e)[3] reads as follows:

_____

[3] In December 2002 Rule 41(e) was relettered as Rule 41(g). We will use the version of the rule in existence at the time of the district court's order. The only difference between Rule 41(e) as

-7-

(e) Motion to Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.[4]

Our earliest opinions on this rule interpreted it broadly as empowering a district court to entertain on equitable grounds a pre-indictment motion for return of property if the government callously disregarded a search warrant victim's constitutional rights. *Hunsucker v. Phinney* concerned a movant's claim that government agents illegally searched his apartment and retrieved materials that the IRS used to recommend a hefty tax assessment against him.[5] Before the IRS could actually make the assessment, Hunsucker filed suit under the declaratory judgment statute and Rule 41(e) requesting a return of the seized property and an order

---

it existed before the most recent amendments and the new Rule 41(g) is that 41(e) contained as the last sentence in the provision: "If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12." The new Rule 41(g) does not contain such a statement, but Rule 41(h) now provides, "A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides."

[4] FED. R. CRIM. P. 41(e) (2001).

[5] 497 F.2d 29, 30-31 (5th Cir. 1974).

prohibiting its use as evidence against him.[6]  The district court

dismissed the case.[7]  Although the basis for the dismissal was

unclear, it appeared to have been grounded in the district court's

finding that Hunsucker's attempt to obtain relief was premature.[8]

In determining whether the dismissal was proper, this court

found that

> [a] substantial body of precedent establishes that
> federal district courts have power to order the
> suppression or return of unlawfully seized property even
> though no indictment has been returned and thus no
> criminal prosecution is yet in existence.  Though firmly
> established, this jurisdiction is an exceptional one....
> The theory articulated by most of the cases is that
> jurisdiction to order suppression or return prior to
> indictment exists not by virtue of any statute but rather
> derives from the inherent authority of the court over
> those who are its officers.[9]

We cautioned, however, that "it does not automatically follow that

this unique power should be exercised wherever it exists.

Rather[,] such jurisdiction should be exercised with caution and

restraint, and subject to equitable principles."[10]

The panel confirmed that Hunsucker's was not a case warranting

exercise of this "anomalous jurisdiction," given that Hunsucker had

not shown that the agents exhibited callous disregard for his

---

[6] *Id.*

[7] *Id.* at 31.

[8] *Id.*

[9] *Id.* at 32 (citations omitted).

[10] *Id.*

constitutional rights since "the search in issue was conducted pursuant to a warrant issued in the normal manner."[11]  Moreover, he had an adequate remedy at law for this allegedly unconstitutional deprivation because, if the IRS did assess the tax, he could bring a refund suit.  Because the government had returned the originals of the documents to Hunsucker before trial, he could not claim that he would suffer an "irreparable injury" from waiting to vindicate his rights "on the theory that some of these materials were necessary to conduct a legitimate business or were otherwise of substantial value to" him.[12]

A year later, in *Richey v. Smith*, we reconsidered the issue of pre-indictment suits under Rule 41(e).[13]  In that case a husband and wife sued in the district court under Rule 41(e) requesting the return and suppression of allegedly illegally seized business records.[14]  The district court dismissed the suit for lack of jurisdiction, because neither plaintiff had been indicted, but noted that the couple could file a motion to suppress in the event that a criminal prosecution followed.[15]  *Richey* explained that *Hunsucker* had listed "some of the considerations that should govern

---

[11] *Id.* at 35.

[12] *Id.*

[13] 515 F.2d 1239 (5th Cir. 1975).

[14] *Id.* at 1241.

[15] *Id.*

the decision by the district court whether to exercise this 'anomalous' jurisdiction," including "[f]irst" and "perhaps foremost," whether the motion for return of property "alleges that government agents ... in seizing the property displayed a 'callous disregard for the constitutional rights of the taxpayer.'"[16]  Other factors a court should consider are "whether the plaintiff has an individual interest in and need for the material whose return he seeks," whether he "would be irreparably injured by denial of the return of the property," and whether he has an "adequate remedy at law for the redress of his grievance."[17]  It noted, without deciding the question, that a motion to suppress may not constitute an adequate remedy at law for a potential criminal defendant, because "'a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted.  The stigma cannot be easily erased.  In the public mind, the blot on a man's escutcheon ... is seldom wiped out by a subsequent judgment of not guilty.'"[18]

The *Richey* panel remanded the case to the district court for a hearing on the plaintiff's allegations.[19]  The court also stated

---

[16] *Id.* (quoting *Hunsucker*, 497 F.2d at 34) (some internal quotation marks omitted).

[17] *Id.* (citing *Hunsucker*, 497 F.2d at 34-35).

[18] *Id.* at 1243 n.10 (quoting *In re Fried*, 161 F.2d 453, 458-59 (2d Cir. 1947)).

[19] *Id.* at 1244.

that the district court would have to decide the appropriate relief to be granted should the plaintiffs prevail, reasoning that "a motion prior to any suggestion of criminal proceedings, as here, is more properly considered simply as a suit in equity rather than one under the Rules of Criminal Procedure," and "[s]o viewed, return of the property would not necessarily entail suppression for the purposes of further court proceedings."[20]  As support for this proposition the court stated that while the taxpayer was entitled "'to be as well off as if (the IRS agent) had not unlawfully seized those papers,'" he was "'not entitled to be any better off.'"[21]

In *United States v. Calandra*, released around the same time as *Richey*, the Supreme Court suggested that the equitable powers of a district court under Rule 41(e) do have certain limitations.[22]  In that case a grand jury witness refused to answer grand jury questions on the ground that they were based on illegally obtained evidence.[23]  Federal agents had secured a search warrant of Calandra's place of business in connection with their investigation into possible illegal gambling operations being carried out there.[24]

---

[20] *Id.* at 1245.

[21] *Id.* (quoting *Lord v. Kelley*, 223 F. Supp. 684, 691 (D. Mass. 1963)).

[22] 414 U.S. 338, 349 n.6 (1974).

[23] *Id.* at 339.

[24] *Id.* at 340.

After the search Calandra moved under Rule 41(e) for suppression and return of the seized evidence, contending that the affidavit supporting the warrant was insufficient and that the search exceeded the warrant's scope.[25] After a hearing the district court ordered the evidence suppressed and returned to Calandra and further ordered that Calandra need not answer any of the grand jury's questions based on the suppressed evidence.[26] The Sixth Circuit affirmed, concluding that the district court "had properly entertained the suppression motion and that the exclusionary rule may be invoked by a witness before the grand jury to bar questioning based on evidence obtained in an unlawful search and seizure."[27]

The government petitioned for certiorari on the issue whether, under the exclusionary rule, Calandra could refuse to answer questions before the grand jury on the ground that they were based on illegally obtained evidence, and the Supreme Court granted certiorari and reversed.[28] The Court reasoned that "[t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence

---

[25] *Id.* at 341.

[26] *Id.* at 341–42.

[27] *Id.* at 342.

[28] *Id.*

considered,"[29] and added, "the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons."[30]

Of paramount importance to the *Calandra* Court was the exclusionary rule's potential for hamstringing grand jury investigations:

> It is evident that this extension of the exclusionary rule would seriously impede the grand jury. Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial. Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective. The probable result would be protracted interruption of grand jury proceedings, effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law.[31]

The Court rejected the view that the deterrent effect extension of the exclusionary rule to pre-indictment proceedings would have on police misconduct overrode these concerns, because "[s]uch an extension would deter only police [misconduct] consciously directed

---

[29] *Id.* at 344–45.

[30] *Id.* at 348.

[31] *Id.* at 349 (internal quotation marks, citations, and footnotes omitted).

toward the discovery of evidence solely for use in a grand jury investigation."[32]  Any incentive on the part of law enforcement "to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim."[33]

Calandra argued that the exclusionary rule applied to grand jury proceedings by way of Rule 41(e), which at that time provided that "[a] person aggrieved by an unlawful search and seizure may move the district court ... for the return of the property and to suppress for the use as evidence anything so obtained."[34]  The Court dismissed Calandra's reliance on the rule, stating that "Rule 41(e) ... does not constitute a statutory expansion of the exclusionary rule."[35]  The Court concluded, "[i]n the context of a grand jury proceeding, we believe that the damage to that institution from" extension of the exclusionary rule "outweighs the benefit of any possible incremental deterrent effect.  Our conclusion necessarily controls both the evidence seized during the course of an unlawful search and seizure and any question or evidence derived therefrom

---

[32] *Id.* at 351.

[33] *Id.*

[34] *Id.* at 348 n.6.

[35] *Id.*

(the fruits of the unlawful search)."[36]

*Calandra* clearly implied that the target of a government investigation could not use Rule 41(e) – which extends no further than the limits of the exclusionary rule – to prevent the grand jury from having access to illegally obtained evidence.[37] In 1989 the Advisory Committee to the Federal Rules of Criminal Procedure, noting *Calandra*, amended Rule 41(e) to omit language dating from 1944 which stated that evidence shall be suppressed if the court grants a motion to return property. Its notes on the amendment explained,

> Rule 41(e) is not intended to deny the United States the use of evidence permitted by the fourth amendment and federal statutes, even if the evidence might have been unlawfully seized. *United States v. Calandra*, 414 U.S. 338, 349 n.6 (197[4]) ("Rule 41(e) does not constitute a statutory expansion of the exclusionary rule.").[38]

The Committee also called into question our suggestion in *Hunsucker* that the victim of an unlawful search has a right not only to return of the original documents but also to all copies, instead proposing that cases which "have held that the government must

---

[36] *Id.* at 355.

[37] This conclusion is bolstered by *Calandra*'s statement that remedies for an illegal search and seizure include a *Bivens* action against the officers who conducted the illegal search and a post-indictment motion for suppression and return of illegally-seized property. *Id.* at 354 n.10. It noticeably omitted from mention the possibility that Rule 41(e) could ever be used by the victim of an illegal search to suppress evidence pre-indictment.

[38] FED. R. CRIM. P. 41(e) (Advisory Committee notes to the 1989 amendments).

return copies of records where the originals were illegally seized ... are questionable in situations in which the government is permitted under Supreme Court decisions to use illegally seized evidence."[39]  It instead cautioned that, even in cases of illegally seized property, "[i]f the United States has a need for the property in an investigation ... its retention of the property generally is reasonable."

Despite these indications that Rule 41(e) cannot block the government's presentation of illegally seized evidence to the grand jury, the Committee notes do leave open the possibility that, in certain circumstances, equitable considerations may warrant the government's return of all seized records.[40]  However, the case it cited as an example of such a situation, *Paton v. LaPrade*,[41] is markedly different from Brown's.  In *Paton*, the Third Circuit confronted the issue whether a plaintiff should be allowed to have

---

[39] *Id.*

[40] FED. R. CRIM. P. 41(e) (Advisory Committee notes to the 1989 amendments) ("As amended, Rule 41(e) avoids an all or nothing approach whereby the government must either return records and make no copies or keep originals notwithstanding the hardship to their owner.... In many instances documents and records that are relevant to ongoing or contemplated investigations and prosecutions may be returned to their owner as long as the government preserves a copy for future use.  *In some circumstances, however, equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized.*" (emphasis added) (citing *Paton v. LaPrade*, 524 F.2d 862, 867-69 (3d Cir. 1975)).

[41] 524 F.2d at 867-69.

her FBI record expunged on the basis that it was the result of an illegal search.[42]  The plaintiff, a high school student, had sent a letter to the Socialist Workers Party requesting information for an assignment in her social studies class.[43]  The FBI illegally intercepted the letter and created a file on the student, and added her name to a name index file with the filing symbol, "SM-SWP," which stood for "Subversive Matter-Socialist Workers Party."[44]  The FBI further investigated the student and learned that she had sent the letter to the SWP for a class assignment and was not herself involved in subversive activities.  However, the FBI did not destroy the file.[45]

The student learned of the FBI's investigation and filed suit under a statute criminalizing mail theft.  She requested expungement of her FBI file on the ground that it "could endanger her future educational and employment opportunities," since Paton "plan[ned] to study Chinese and then seek governmental employment."[46]  The district court ordered expungement.  The Third Circuit vacated the ruling on the basis that the factual record did not support the order, since it did not reveal "the scope and form

---

[42] *Id.*

[43] *Id.* at 865.

[44] *Id.* at 866.

[45] *Id.*

[46] *Id.* at 868.

-18-

of dissemination of the Paton file, its utility to the FBI, and the pertinent facts necessary for a determination of the legality of the mail cover."[47]

The Advisory Committee apparently believed that in a similar situation a district court could properly order complete destruction of the file under Rule 41(e). Importantly, *Paton* did not concern an ongoing criminal investigation, but instead a closed one. The balance of equities in such a situation would more likely favor complete destruction or return of the evidence than in circumstances such as Brown's, where the grand jury investigation into his activities is ongoing.[48]

Although the commentary to Rule 41(e) does not absolutely foreclose use of the rule to suppress evidence going before a grand jury, we are convinced by both *Calandra* and the Advisory Committee's notes that Rule 41(e) does not permit a district court to order complete suppression of seized evidence absent, at the very least, a substantial showing of irreparable harm. Even prior to the amendments, the Supreme Court recognized that a suppression motion under Rule 41(e) should not be granted absent proof of such

---

[47] *Id.* at 869.

[48] The government confirmed at oral argument that although the grand jury has indicted Brown on federal tax charges the grand jury investigation is still active.

injury.[49]  Such a showing is imperative given the concerns *Calandra*

voiced about impeding a grand jury investigation, which have all

materialized in Brown's case.  The government has been unable to

view any of the seized evidence since entry of the protective order

in October 2000, and the district court did not decide the motion

for return of property until almost two years after Brown filed it.

As the *Calandra* Court feared would be the probable result if the

exclusionary rule were extended to pre-indictment proceedings, the

result of Brown's 41(e) motions has been "protracted interruption"

of the grand jury investigation, and a three-day evidentiary

hearing that was "effectively ... [a] preliminary trial[] on the

merits."[50]

---

[49] In *G. M. Leasing Corp. v. United States*, the Supreme Court
seconded our view in *Hunsucker* that a necessary prerequisite to a
Rule 41(e) suppression remedy was the movant's showing of
irreparable harm, reasoning:

> The suppression issue, as to the books and records,
> obviously is premature and may be considered if and when
> proceedings arise in which the Government seeks to use
> the documents or information obtained from them. *And the*
> *irreparable injury required to support a motion to*
> *suppress, under Fed. Rule Crim. Proc. 41(e), on equitable*
> *grounds in advance of any proceedings, has not been*
> *demonstrated.*

429 U.S. 338, 359-60 (1977) (emphasis added) (citing *Hunsucker v.*
*Phinney*, 497 F.2d 29, 34 (5th Cir. 1974)).

[50] *Calandra*, 414 U.S. at 349-50 (internal quotation marks
omitted).  The facts of Brown's case resemble Calandra's, in which
almost two and a half years elapsed between the time Calandra was
summoned to appear and testify before the grand jury and the date
on which the Supreme Court issued its decision.  *Id.* at 349 n.7.
The Court reasoned, "[i]f respondent's testimony was vital to the

-20-

Despite the necessity of proving irreparable harm, Brown has given short shrift to this component of 41(e). Given that the government has allowed Brown constant access to the records since their seizure and has been hospitable to his staff's copying of any needed record, Brown does not contend that the government's possession of the seized documents does irreparable injury to his business. Instead, he urges that the government's alleged invasions into attorney-client privileged documents justify the district court's order. However, as the government pointed out to the district court, despite his ready access to the evidence, at no time has Brown made any effort to identify specific privileged documents in the hands of the government or provide a legal basis for asserting a particular privilege. Brown has failed to indicate the amount of privileged documents the government has or the volume of privileged documents the government taint team allegedly perused after seizure. Instead, his argument, both in the district court and in our court, has consisted of vague allegations that the government viewed extensive amounts of privileged information during the search of his law office and after the documents' seizure. Since Brown has failed to offer proof substantiating these assertions, they do not suffice to prove irreparable injury warranting the drastic relief granted by the district court.

Brown also argues that he will suffer irreparable harm because

_____

grand jury's investigation ... it is possible that this particular investigation has been completely frustrated." *Id.*

-21-

of the reputational damage he would suffer from being indicted. After the government filed the appeal, the grand jury did indict Brown on federal tax charges without the benefit of the evidence at issue. We will nonetheless address Brown's argument because the potential exists that the grand jury could yet rely on the seized evidence to indict Brown on additional charges. In *Richey* we cautioned that "'a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted.'"[51] At the same time, the Ninth Circuit more recently observed, "if the mere threat of prosecution were allowed to constitute irreparable harm [for purposes of Rule 41(e)], every potential defendant could point to the same harm and invoke the equitable powers of the district court .... [T]he district court's exercise of its equitable jurisdiction would not be extraordinary, but instead quite ordinary."[52] The 1989 amendments to Rule 41(e) and the Advisory Committee's notes on those amendments encourage courts to focus on the harmful effects the loss of the property wreaks on the movant.[53] Taking that nudge, we conclude that the irreparable harm

---

[51] *Richey v. Smith*, 515 F.2d 1243 n.10 (quoting *In re Fried*, 161 F.2d 453, 458–59 (2d Cir. 1947)).

[52] *Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993).

[53] This is reflected in the fact that subsequent to the 1989 amendments the rule allows a victim of even a lawful search and seizure to move for the return of property. *See* FED. R. CRIM. P. 41(e) (2001). Moreover, the commentary to the amendments emphasize that courts should balance "law enforcement interests" in the property with the movant's possessory interest in the property and

which Brown must have proven to prevail in the Rule 41(e) proceeding must have focused on the injury to Brown from loss of the property, not simply harm from the grand jury's reliance on the illegally seized evidence in indicting him – *Calandra* allows that.

## III.

Brown has not demonstrated the harm necessary to support the district court's order requiring return and complete suppression of the evidence. We VACATE the district court's order and REMAND with instructions to the district court to dismiss this civil proceeding. We express no opinion on any motion to suppress Brown may file in his now pending criminal case.[54]

VACATED and REMANDED.

---

the "hardship" to the property owner from loss of the property. *Id.* (Advisory Committee notes to the 1989 amendments).

[54] We do not pass upon Brown's allegations that the government possesses potentially privileged information. We leave those to the district court in which the criminal proceeding is pending.