**CONSUMER CREDIT INSURANCE AGENCY, INC., et al., Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 76–2583.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1978.

Decided June 13, 1979.

Bernard A. Berkman, Berkman, Gordon, Kancelbaum & Levy, J. Michael Murray, Cleveland, Ohio, Marc P. Richman, Silver Spring, Md., for plaintiffs-appellants.

James R. Williams, U. S. Atty., Cleveland, Ohio, Kenneth A. Bravo, Pittsburgh, Pa., Kathleen A. Felton, Crim. Div., App. Section, Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WEICK, ENGEL and MERRITT, Circuit Judges.

ENGEL, Circuit Judge.

Plaintiffs commenced an action in the district court pursuant to Rule 41(e), Fed.R. Crim.P., seeking return of certain corporate books, correspondence, memoranda, books of account and like corporate documents, which they alleged had been unlawfully seized pursuant to "forthwith" grand jury subpoenas *duces tecum*.

On the morning of September 10, 1976, Special Agent Terry A. Lyons of the FBI went to the office building at 514 Prospect Avenue, Cleveland, Ohio, wherein plaintiffs had their offices on the fifth floor. On the ground floor he identified and introduced himself to Allan M. Wachs, who worked for the plaintiffs in the building. Lyons and Wachs had known each other as the result of a previous investigation of the affairs of the Northern Ohio Bank. Upon Lyons' representation that he wanted to discuss Wachs' business activities with him, Lyons was invited to proceed to the company's fifth floor offices for the purpose of continuing the discussion. At that time Lyons was joined by Special Agents Fetterman and Graessle.

Once access had been gained to the fifth floor, Lyons served two "forthwith" subpoenas *duces tecum* upon Wachs and Thomas D. Bosse, who arrived shortly after the agents. Bosse, like Wachs, was employed by the plaintiffs and, the trial court found, was in charge of the office. At that time Bosse was also served with a warrant for the search of "[t]he top right hand drawer of a brown wooden desk used by Gennaro J. Orrico" for a firearm which was believed to have been possessed by him there in violation of 18 U.S.C. App. § 1202(a)(1) (1976).[1] Upon service of the subpoena and of the search warrant, Bosse immediately advised the agents that he would consult with his attorney and thereupon put a call in to Robert H. Jackson, a partner in the law firm of Kohrman & Jackson Company, LPA, legal counsel for plaintiff corporations and Bosse. The government agents were then joined by Kenneth A. Bravo, Special Attorney for the Department of Justice assigned to the Strike Force, and two additional FBI agents.

After substantial discussion between Wachs, Bosse and one Stephen Kalette, an attorney with the law firm of Kohrman & Jackson who had meanwhile arrived pursuant to Bosse's call, Robert H. Jackson appeared on the scene to consult with Wachs, Bosse and Kalette and to examine the subpoenas. Bosse, with Jackson's concurrence, asked that Bravo and the FBI agents stay in order to determine whether certain records were covered by the subpoenas. Jackson then departed, leaving Kalette to render further counsel.

---

1. The search of the drawer produced a handgun, as indicated, but it later turned out to be an imitation.

For the remainder of the morning and into mid-afternoon Bosse, Wachs and Kalette continued intermittently to express their desire to cooperate in satisfying the requirements of the subpoenas. None of these individuals nor anyone else, according to the district court's findings, requested or directed the agents to leave the premises. Any examination of the records by the agents was found to have been upon the express consent of Bosse and Wachs, with no objection from Kalette. Immediately prior to the removal of the documents, Jackson was contacted by telephone for advice, yet thereafter Wachs, Bosse and Kalette continued to cooperate with the agents. After the review of plaintiffs' files was completed, the documents whose return is now sought were produced and delivered to the grand jury for use in its then-pending investigations.

The plaintiffs' motion made before the district court detailed a number of charges that the subpoenas were invalid and that the government conduct under the circumstances here was so tainted that they were in all events entitled to relief. Essentially they claimed that the subpoenas were overbroad, that the search warrant was but a ruse to enable the officers to gain entrance to the building, and that in the service of the subpoenas, the FBI agents were guilty of trespass and of threats and intimidation which coerced them into consenting to the delivery of the documents and which rendered their consent invalid.

An evidentiary hearing was held before United States District Judge Robert B. Krupansky, who thereafter filed extensive factual findings, concluding that the plaintiffs' consent to the search had been voluntary and that the documents had been lawfully seized. The court made the following ruling:

> [P]laintiffs' Motion for Return of Seized Property, pursuant to Rule 41(e), Fed.R.Crim.P., must be and hereby is denied. It appearing to the Court, however, that the great volume of documents subpoenaed from petitioners could understandably impede the operation of their business for a protracted period, the Court hereby ORDERS the Government to return to petitioners the originals of all documents produced pursuant to the instant subpoenas duces tecum by October 18, 1976. This Order does not preclude the Government from copying any or all such records.[2]

2. We are troubled by the issue of jurisdiction over the appeal from the district court's order, but in view of our conclusion that plaintiffs are not in any event entitled to relief under Rule 41(e), we find it unnecessary to resolve the question. We do not conceive that the issue of appellate jurisdiction is resolved solely by reference to whether a criminal proceeding has been initiated by indictment or information. As the Supreme Court held in *DiBella v. United States*, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962): "the mere circumstance of a preindictment motion [under Rule 41(e)] does not transmute the ensuing evidentiary ruling into an independent proceeding begetting finality *even for purposes of appealability.*" *Id.* at 131, 82 S.Ct. at 660 (emphasis added). Based upon the relationship between a Rule 41(e) proceeding and the ongoing grand jury process, and the importance of avoiding a bifurcation even where no indictment has been returned, *see id.* at 126–29, 82 S.Ct. 654, the Court concluded that a ruling upon a preindictment motion under Rule 41(e) is appealable in the following limited circumstance: "*Only* if the motion is *solely* for return of property *and* is in no way tied to a criminal prosecution *in esse* against the movant can the proceedings be regarded as independent." *Id.* at 131–32, 82 S.Ct. at 660 (emphasis added). Both conditions must be satisfied. *See Hill v. United States*, 346 F.2d 175, 178 (9th Cir.), *cert. denied*, 382 U.S. 956, 86 S.Ct. 433, 15 L.Ed.2d 361 (1965). *See generally* C. Wright, Federal Practice & Procedure: Criminal § 678 at 139 (1969) (*DiBella* "sharply restricted" the notion that the denial of a preindictment motion under Rule 41(e) is final and appealable).

Bearing in mind that the burden is upon the appellants to satisfy the court that it has jurisdiction over the appeal, *see Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884); *Chapman v. Houston Welfare Rights Organization*, —— U.S. ——, ——, n. 28, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), we entertain doubts whether the instant appeal pertains "solely" to return of property, the district court having ordered the government to return the originals. In other words, any interest which plaintiffs have in receiving their business records has been fully met; the remaining relief sought on appeal is to deprive the government of any further evidence derived from the documents.

Our review of the record convinces us that there is much in the conduct of the officers here which we cannot approve if plaintiffs' version of the facts is to be believed. Nonetheless, after personally hearing the witnesses, Judge Krupansky elected to assign greater weight and credibility to the government's witnesses than to the plaintiffs' with respect to the issue of voluntariness. In support of his finding is the fact that plaintiffs' agents consented to the examination and delivery of documents only after advice of their counsel, Jackson, and his associate, Kalette, who was present at the scene during the entire episode and who oversaw and approved the final delivery of possession to the agents. It is also noteworthy that Jackson testified to having advised Bosse that he was not required to turn over the documents sought.

We are not impressed with plaintiffs' characterization that Kalette, the attorney sent from the firm of Kohrman & Jackson, was only a "law clerk" and somehow allowed himself to be intimidated by the aggressive behavior of the government agents. He was admitted to practice; he was sent by a responsible law firm; he was accepted by the clients for that purpose, and had been introduced to the agents by Bosse and Wachs as "their attorney." He gave advice to them, and they followed that advice. Moreover, the evidence showed that Jackson, Kalette's superior, also participated significantly in the rendering of advice. In the absence of other persuasive evidence, we do not think it is appropriate to assume, because of the attorney's relative inexperience, that he was incompetent to give proper advice or that any consent based upon the advice he actually gave was involuntary under the circumstances. Judge Krupansky did not.

Appellants also rely upon a confrontation between Special Attorney Bravo and Orrico, who arrived at 2:35 p. m. and who was then served with a subpoena identical to the two previously served upon Wachs and Bosse. While Orrico's testimony stresses the coercive nature of the events in issue, Bravo's testimony places the incident in a different light:

[The conversation occurred] just at the time we were getting ready to leave and we were located in the large open area of the office in the end, close to the elevators. Mr. Orrico began talking, I don't believe at first directly to me, saying that he was not going to the Grand Jury and then he looked in the direction of Agent Lyons and myself and said, "If you want me to go you're going to have to take me in handcuffs."

I then explained to Mr. Orrico that he had been served with a subpoena, that until such time as a Court ruled to the contrary I expected that he would obey that subpoena and in the event he did not, we would have no alternative but to ask a Federal Judge in this district to rule on the question of whether or not a warrant should be issued.

It is clear from the foregoing that Orrico objected not so much to the collection of documents, at issue here, as to the subpoena insofar as it called for his personal presence. Moreover, the district court failed to find, as plaintiffs urged, that Bravo "threatened" Orrico.

Following Orrico's recalcitrance Bravo talked to Bosse, informing him of the possi-

While the plaintiffs represent that they "are not seeking suppression of [the] copies but only their return," the necessary consequence of enlarging the relief granted by the district court is that the evidence will be unavailable for the grand jury's further consideration. *But see United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (exclusionary rule inapplicable to grand jury proceedings). In this circumstance we conceive that an appeal aimed solely at the return of copies may lack the requisite independence from the extant grand jury probe, *Meister v. United States,* 397

F.2d 268 (3d Cir. 1968), even accepting *arguendo* the proposition that, on the merits of the claim, Rule 41(e) applies to copies as well as originals. *Goodman v. United States,* 369 F.2d 166, 168 (9th Cir. 1966). We do not read *G. M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), as addressing the issue, let alone settling it. To the extent that the case is relevant, *G. M. Leasing* supports the conclusion that the within appeal is premature, particularly in view of the Court's favorable reference on this point to *Meister, supra,* 429 U.S. at 359, 97 S.Ct. 619.

ble adverse publicity which would attend noncompliance. In fact, apparently unknown to Bravo, plaintiffs' attorney Jackson had likewise earlier counselled Bosse that resistance could generate adverse publicity. Bosse then talked to Orrico and prevailed upon him to comply.

We cannot agree that Bravo's statements to Bosse and Orrico were coercive and overbore their will. The agent's observations were not shown to have been untrue, and they may have in fact been realistic arguments which a prudent businessman would have wished to consider in determining whether to comply. Moreover, Kalette was on the scene to provide advice, and Jackson was consulted by telephone. That compliance was obtained only after extensive consultation with counsel diminishes whatever coercive effect Bravo's statements may have had.

■ The plaintiffs also claim that the officers, after having executed the search warrant and having served the subpoenas, should immediately have left the premises. We might agree if the trial judge had found that they had been asked to leave. They were not, however, but rather had been invited to stay by Bosse, found by the district court to be in charge of the office, in order that they might assist in compliance. We reject the claim that their presence on the premises amounted to so high a degree of coercion under the circumstances as to nullify the otherwise proper effect of the subpoenas in producing the documents desired, since, as the district court found, the agents "never entered into any physical space without the express permission of plaintiffs," and in fact remained upon an express invitation to do so. It must be remembered that these were business offices, that the agents entered in the company of and with the permission of Wachs, that entry was in the daytime, and that

there were other office employees present at the time, thus diminishing any impact of a show of force. While we do not condone the procedure employed by the government, we accept the district court's finding that compliance was voluntary. We hold, in conclusion, that the plaintiffs were not "aggrieved by an unlawful search and seizure" and are thus not entitled to relief under Rule 41(e).[3]

■ Finally, we are bound to note that while in a technical sense, the motion was denied, the trial judge has in fact granted the plaintiffs the relief which they initially sought: return of the documents, subject, however, to the government's right to make copies. To the extent that the motion for return stems from plaintiffs' concern for the privacy interests of themselves and their clients, we conceive that their remedy at this stage is to seek a protective order in the district court under Rule 6(e), Fed.R. Crim.P., which would effectively recognize those rights, limiting the disclosure and use of the copies to the grand jury proceedings and any criminal prosecutions which may follow in their wake. While the plaintiffs have not seen fit to do so, we have no doubt that the district judge, who carefully considered their interests in the first place, would be fully willing and able to consider such a protective order.

Affirmed.

WEICK, Circuit Judge.

I respectfully dissent. The majority opinion permits the FBI to effect an unlawful search and seizure of all the books and records of the plaintiff corporations for a period covering the thirty-three months immediately preceding the seizure, by using as many as five FBI Agents and one Special Attorney of the Department of Justice to coerce immediate compliance with over-

---

**3.** In view of our conclusion that the custodians consented to the delivery of plaintiffs' records, we find it unnecessary to reach the claim that the documents were illegally seized because the subpoenas were too sweeping in their scope to be considered reasonable. *See, e. g., Hale v. Henkel*, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed.

652 (1906). We note that the government has not claimed that there remain further documents and has not sought court enforcement of the subpoenas with respect to other evidence not voluntarily provided. Our holding is without prejudice to any right of plaintiffs to resist further disclosures.

broad, unlawful forthwith grand jury subpoenas duces tecum. It constituted a gross abuse of the Grand Jury process.

Actually, unless coercion was intended, the grand jury subpoenas could and should have been served by a single United States Marshal and after serving the subpoenas the Marshal should leave the premises of the subpoenaed persons.

In footnote 2 the majority is "troubled" about the Court's jurisdiction over this appeal, but found it unnecessary to resolve that question because of its conclusion that plaintiffs are not entitled to relief. However, the majority should not be troubled because if this Court had no jurisdiction the majority was without power to rule on the merits of the case, and its decision on the merits would be pure obiter dictum.

The Government never filed a motion to dismiss the appeal for lack of jurisdiction, no doubt because such a claim would be plainly frivolous.

## I

The majority, in footnote 2, correctly states the applicable jurisdictional rule. The order is appealable "only if the motion is solely for return of property and is in no way tied to a criminal prosecution *in esse* against the movant . . . ." *DiBella v. United States*, 369 U.S. 121, 131–32, 82 S.Ct. 654, 660, 7 L.Ed.2d 614 (1962). The plaintiffs herein have appealed from the entire order of the District Court quoted by the majority, *ante* at 772, which *began* by denying the motion for return of seized property. Denial of such a motion is plainly appealable. If that ruling was incorrect, as I believe it to be, the District Court was not entitled, *sua sponte*, to authorize the Government to make copies because the entire order was invalid.

The majority would use the "relief" granted by the District Court, which was never sought by either party, to change the nature of the motion brought by the plaintiffs. The fact is that the plaintiffs have never sought other than the return of property. There is simply no reason to treat the motion other than as the plaintiffs have brought it.

Moreover, even if one views this case as only involving copies, there is ample authority that copies are property and may properly be the subject of a motion for return of property. *Richey v. Smith*, 515 F.2d 1239, 1242–43 n.5 (5th Cir. 1975); *VonderAhe v. Howland*, 508 F.2d 364, 368 (9th Cir. 1975); *Honsucker v. Phinney*, 497 F.2d 29, 35 (5th Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); *Goodman v. United States*, 369 F.2d 166 (9th Cir. 1966). *But see Meister v. United States*, 397 F.2d 268 (3d Cir. 1968) (per curiam). Also the majority ignores the fact that in *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 359, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), the Court found that the motion for return of property was moot both because the originals had been returned, *and because the photocopies had been destroyed.*

Finally, although the majority opinion is unclear on this point, it is plain that the present motion is "in no way tied to a criminal prosecution *in esse* against the movant . . . ." *DiBella, supra*, 369 U.S. at 132, 82 S.Ct. at 660. In the more than two and one-half years since the District Court entered its order, two separate Grand Juries have had access to the documents, and yet neither Grand Jury has handed down any indictments relating to these records and the plaintiffs or their custodians. Thus, this is not a case "[w]hen at the time of ruling there is outstanding a complaint, or a detention or a release on bail following arrest, or an arraignment, information, or indictment . . . ," *DiBella, supra*, 369 U.S. at 131, 82 S.Ct. at 660, so that there is in fact "no criminal prosecution pending against the movant," *United States v. Ryan*, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971). *See Sovereign News Co. v. United States*, 544 F.2d 909 (6th Cir. 1976) (per curiam), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 73 (1977).

In my view the order was final and was fully appealable. *See United States v. Williams*, 459 F.2d 909 (6th Cir. 1972) (per

curiam); *Coury v. United States,* 426 F.2d 1354 (6th Cir. 1970).

## II

I am not unmindful that the voluntariness of the consent in this case is "a question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). As such, the District Court's finding must be clearly erroneous before we can overturn it, *United States v. Hearn,* 496 F.2d 236, 242 (6th Cir. 1974); but as we recently said in *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir. 1977):

> Consent "must be proved by 'clear and positive testimony,' *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921), and 'must be unequivocal, specific and intelligently given, uncontaminated by *any duress or coercion,'* *Simmons v. Bomar,* 349 F.2d 365 (6th Cir. 1965)." *United States v. Hearn, supra,* 496 F.2d at 244. [Emphasis added.]

At the outset, it must be noted that the majority has totally ignored the fact that the FBI engaged in what is, at minimum, the highly unusual procedure of using as many as five FBI agents and one Special Attorney to serve and "enforce" forthwith grand jury subpoenas duces tecum. The normal practice, and the one which is contemplated by the Federal Rules of Criminal and Civil Procedure, is that subpoenas will be served by a U.S. Marshal. Fed.R.Cr.P. 17(d); Fed.R.Civ.P. 45(c); *see* L.Cr.R.3(d) (N.D.Ohio). The majority also ignores the fact that the plaintiffs' building was equipped with a locked security system. The agents achieved admittance through the system only after making obscure refer-

ences to "business" which had to be discussed with Wachs. His subpoena could have been served on the street, but was not.

The majority makes much of the fact that the agents allegedly were "requested" to remain in order to aid in the assembly of documents. They ignore, however, the fact that Agent Lyons' testimony showed the absence of any "request" for the federal agents to remain on the premises until after they had already been there for more than an hour. App. 76, 77. Moreover, there is no suggestion whatever that the plaintiffs' custodians ever "requested" the FBI personnel to summon the help of Special Attorney Bravo and the two additional FBI agents that he brought with him.

It is apparent that from almost the outset, three FBI agents and one Government attorney were present on the plaintiffs' premises. Unless the agents, from the beginning, intended to enforce compliance with the subpoenas I can find no reason for such an initial show of force, particularly after the execution of the search warrant and the removal of the toy pistol which had been used as a paper weight, and which was found in a desk drawer.

As soon as the agents had executed the search warrant and had completed service of the three forthwith subpoenas duces tecum, they had finished their task and should have left the premises immediately. The obvious purpose of their remaining at the plaintiffs' place of business was for duress and coercion, to enforce compliance with the forthwith subpoenas. This was not their function and they had no lawful right to engage in such activity.

In this context the use of the forthwith command itself became coercive.[1] The rec-

---

1. Of course, the use of a forthwith subpoena will not in most circumstances work to vitiate otherwise voluntary compliance. Certainly it is proper to require forthwith return where the grand jury has reason to believe that the items might otherwise be destroyed. But the danger of the forthwith subpoena is that it places a premium on the party's knowledge of his right to refuse until the subpoena has been tested in court. Its use tends to blur the distinction between traditional arrests and searches, on

the one hand, and traditional subpoenas on the other. As the Supreme Court recognized in *United States v. Dionisio,* 410 U.S. 1, 10, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973):

> The compulsion exerted by a grand jury subpoena differs from the seizure effected by an arrest . . .
>
> "The latter is abrupt, is effected with force or the threat of it and often in demeaning circumstances . . . . A subpoena is served in the same manner as other legal

ord shows that the federal agents more than once emphasized that they expected immediate compliance. App. 105, 175, 298. At no time did the agents or Special Attorney Bravo inform the plaintiffs' custodians of the right to refuse to comply in order to seek to test the validity of the subpoenas. *See Schneckloth, supra*, 412 U.S. at 227, 93 S.Ct. 2041. If anything, the inference from their statements was that the plaintiffs' custodians had no choice but to comply at once. It appears that the forthwith command simply provided the agents with an excuse to remain on the premises until either compliance was effected or they were forced to leave.

It may also be noted that the District Court found that the FBI provided the van to carry the records only after the plaintiffs' custodians stated that they had no means to transport the file cabinet and three cartons of documents. While this finding is supported in the record, it is also consistent with a plan by the agents to ensure that they obtained immediate custody of the documents. Indeed, Agent Lyons admitted that the agents chose to obtain the records by means of a forthwith subpoena duces tecum because they lacked probable cause to obtain a search warrant. While it is axiomatic that the grand jury need not have probable cause to issue a subpoena, *see United States v. Bisceglia*, 420 U.S. 141, 147–48, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975), the subpoena itself cannot be transformed into an instrument by which an illegal search or seizure is effectuated. *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *see United States v. Ryan*, 455 F.2d 728 (9th Cir. 1972).

The majority relies heavily on the fact that the plaintiffs' custodians acted with the advice and assistance of counsel. While the presence of counsel is a factor to con-

sider, *Schneckloth, supra*, 412 U.S. at 226, 93 S.Ct. 2041, it is not conclusive. The undisputed evidence showed that the plaintiffs' attorney was unfamiliar with criminal practice and the procedures surrounding forthwith subpoenas, and that this fact was communicated to Bosse. App. 222, 225. Thus the normal salutary effect of counsel's presence was diminished in this case.

The majority states that attorney Jackson told Bosse that he was not "required" to turn over the documents. I believe that a fair reading of that portion of the record shows that Jackson advised that Bosse could "resist physically," but that Jackson did not know what the legal consequences of such an action would be. Jackson suggested that such resistance might subject Bosse to arrest. App. 220–28.

It is plain that Jackson *never* advised that Bosse had the right to test the validity of the forthwith grand jury subpoenas by filing a motion in court prior to turning over the documents. Any suggestion to the contrary is simply wrong.

The majority also relies on the advice provided by attorney Kalette, Jackson's young associate. The evidence showed rather plainly that Kalette initially tried only to preserve the status quo pending the arrival of attorney Jackson. The majority does not appear to contend otherwise. And the District Court found that after Jackson left, Kalette's activities were pursuant to Jackson's instructions. There is simply no evidence that Kalette's advice was ever any different or any better than that offered by Jackson.

It is also significant to note that the plaintiffs hired a new law firm to represent them in this matter almost immediately after the documents were delivered to the Grand Jury. Within six days of the delivery of the records, the motion presently before this Court was filed in the District

process; it involves no stigma whatever; if the time for appearance is inconvenient, this can generally be altered; and it remains at all times under the control and supervision of a court."
*United States v. Doe (Schwartz)*, 2 Cir., 457 F.2d at 895, 898.

Since subpoenas are generally served without any antecedent judicial intervention, reviewing courts should be cautious where it appears that the forthwith requirement may have been used to preclude any review.

Court. The plaintiffs were evidently dissatisfied with the quality of the advice and representation provided by Jackson and Kalette.

The majority does state:

> . . . [T]here is much in the conduct of the officers here which we cannot approve if plaintiffs' version of the facts is to be believed.

Nevertheless, however politely the majority wishes to view it, it is clear from the record that Special Attorney Bravo admitted that he threatened Orrico with arrest and threatened Bosse with unfavorable publicity when Orrico initially refused to comply with the subpoenas. Whether his primary objection was to personal appearance or to the production of documents, the fact is that Orrico was threatened when he indicated a desire to resist *immediate compliance.*

Accordingly, even if one assigns greater weight and credibility to the testimony of the Government's witnesses, the following facts emerge as uncontroverted: First, at least three, and as many as six, Government agents (including Special Attorney Bravo) were present on the plaintiffs' premises for over an hour before any "request" was made that they stay at all. Second, the FBI agents and Special Attorney Bravo repeatedly emphasized that the forthwith command of the subpoenas mandated immediate compliance. Third, the plaintiffs' custodians were never informed by the Government agents of the right to refuse compliance in order to test the validity of the subpoenas. Fourth, Special Attorney Bravo admittedly threatened plaintiffs' custodians with arrest and with unfavorable publicity. Fifth, the normally beneficial effects of the advice and presence of counsel were reduced in this case because Attorney Jackson expressed ignorance of the plaintiffs' rights under a forthwith subpoena duces tecum, and the plaintiffs did obtain, promptly, other counsel to file their motion for the return of property.

In my opinion the duress and coercion exerted here was much greater than that which was involved in *United States v.* *McCaleb,* 552 F.2d 717 (6th Cir. 1977), which condemned *"any duress or coercion," id.* at 721 (emphasis added), quoting *Simmons v. Bomar,* 349 F.2d 365, 366 (6th Cir. 1965) (per curiam).

Because of the uncontroverted evidence as to duress and coercion, the District Court's conclusion that the compliance was voluntary is not supported by substantial evidence, and is clearly erroneous.

### III

The plaintiffs are not entitled to relief under Fed.R.Cr.P. 41(e) unless they have established that they are entitled to the lawful possession of property which has been illegally seized. A subpoena duces tecum will constitute such an illegal seizure when it is "far too sweeping in its terms to be regarded as reasonable." *Hale v. Henkel,* 201 U.S. 43, 76, 26 S.Ct. 370, 380, 50 L.Ed. 652 (1906). *See e. g., Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *Brown v. United States,* 276 U.S. 134, 142–43, 48 S.Ct. 288, 72 L.Ed. 500 (1928); *Boyd v. United States,* 116 U.S. 616, 621–22, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The present subpoenas were unreasonable and therefore unlawful.

The cases demonstrate that in addition to the requirement that the Grand Jury pursue an investigation only "for a lawfully authorized purpose," *Oklahoma Press Publishing Co., supra,* 327 U.S. at 209, 66 S.Ct. 494, a Grand Jury subpoena duces tecum must limit its scope to matters somehow relevant to the investigation, and must limit its burdensomeness by specifying the documents desired with reasonable particularity, and by focusing on a reasonable time period. *Id.; United States v. Gurule,* 437 F.2d 239, 244 (10th Cir. 1970), *cert. denied sub nom. Baker v. United States,* 403 U.S. 904, 91 S.Ct. 2202, 29 L.Ed.2d 679 (1971); *Schwimmer v. United States,* 232 F.2d 855, 861 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *McMann v. S.E.C.,* 87 F.2d 377, 379 (2d Cir.), *cert. denied,* 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937). And in evaluating the burden imposed, it is important to consider whether

the documents sought are part of an ongoing business, or instead relate to a defunct operation. *Hale v. Henkel, supra,* 201 U.S. at 76–77, 26 S.Ct. 370; *In re Horowitz,* 482 F.2d 72, 79 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *cf. Wheeler v. United States,* 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913). In addition, other factors may be considered in appropriate cases. *Oklahoma Press Publishing Co., supra,* 327 U.S. at 209, 66 S.Ct. 494; *Boyd v. United States, supra,* 116 U.S. at 630, 6 S.Ct. 524.

There is no fixed requirement that the subpoenas recite either the purpose of the investigation or the precise relevance of each document sought, although these matters may be inquired into by the District Court on an appropriate motion. What is required, however, is that the subpoena duces tecum express limitations as to the time period involved and either as to the subject matter or the class of documents sought, or both, as appropriate. No precise formula can be stated. The requirements of "reasonableness" will vary in each case, but will almost certainly include consideration of the type of documents sought, the age of the documents, the availability of the documents, the requirements of the particular business, as well as the type of investigation being conducted. *See Oklahoma Press Publishing Co., supra,* 327 U.S. at 208–09, 66 S.Ct. 494; *Hale v. Henkel, supra,* 201 U.S. at 76–77, 26 S.Ct. 370.

In the present case the subpoenas commanded the production forthwith of:

> all books and records of Consumer Credit Insurance Agency, Inc., Consumer Fidelity Insurance Agency, Inc., Lee Hoffman and Associates, Thomas A. Mills and Associates, Inc., and American International Assurance Co., Ltd., for the period from January 1, 1974 to September 9, 1976 said records to include, but not be limited to, corporate minute book(s), correspondence, memoranda, books of account including all journals and ledgers, bank statements, cancelled checks, check stubs, savings account books, records of all insurance policies written, computer printouts, all

agreements, contracts, treaties, or understandings with any insurance companies and any agreements, contracts, treaties or understandings with any automobile trailer, boat or mobile home dealers.

By their terms they required the production of "all books and records" of the five companies, including, but not limited to:

> corporate minute book(s), correspondence, memoranda, books of account, including all journals and ledgers, bank statements, cancelled checks, check stubs, savings account books, records of all insurance policies written, computer printouts. . . .

Only two categories of items were limited to a particular type of transaction:

> . . . all agreements, contracts, treaties, or understandings with any insurance companies and any agreements, contracts, treaties or understandings with any automobile, trailer, boat, or mobile home dealers.

It can be fairly said that the subpoenas required the production of all of the plaintiff's business records for the period of two years and nine months immediately preceding the date of service of the subpoenas. Moreover, it would be difficult to find a clearer case where the production of documents "more completely put a stop to the [plaintiffs'] business . . . ." *Hale v. Henkel, supra,* 201 U.S. at 77, 26 S.Ct. at 380.

The District Court explicitly recognized this when it ordered the return of the originals. Moreover, it is noteworthy that the District Judge quashed a fourth substantively identical subpoena served on one of the plaintiffs' employees, Paul Paczolt, because the Court found the subpoena was impermissibly overbroad. *In re Grand Jury Subpoena Addressed to Paul Paczolt, Custodian of Records,* No. C–76–998 (N.D.Ohio, Sept. 17, 1976). This holding by the same District Judge supports the plaintiffs' contention that the three identical forthwith subpoenas in the present case are invalid as being impermissibly overbroad and unreasonable.

In its brief, the Government relies on *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), for the proposition that a subpoena duces tecum which requires the production of records covering two years is not invalid. Aside from the fact that *Bellis* deals with an asserted Fifth Amendment privilege, and not a Fourth Amendment violation, it is important to note that the subpoena in *Bellis* had been judicially limited to financial records, 417 U.S. at 86–87 & n.1, 94 S.Ct. 2179, and that it related to a partnership no longer in existence. It did not, as in the present case, stop the operation of plaintiffs' business.

Similarly, *Wheeler v. United States, supra*, also cited by the Government, involved the records of a defunct corporation, and the subpoena particularly stated the classes of records sought, if not the particular subject matter. *See* 226 U.S. at 483, 489–90, 33 S.Ct. 158.

Finally, in *Brown v. United States, supra*, the subpoenas specified the subject matters of the requested records. In addition, Brown had previously complied with an identical subpoena without difficulty. 276 U.S. at 143, 48 S.Ct. 288.

In this case the Grand Jury forthwith subpoenas duces tecum amounted to an illegal search and seizure. They demanded, without any substantial limitation as to the subject matter of the class of document sought, the forthwith production of all of the business records of the plaintiffs for a period of two years and nine months. Because of their sweeping command, and because they focused on the most current records, these subpoenas unreasonably burdened the plaintiffs and interfered impermissibly with the ongoing operation of their businesses. Such an unlawful practice should be stopped in its tracks by the Court.

The judgment of the District Court should be reversed and the cause remanded with instructions to order the return of the copies of the records to the plaintiffs.