**Peter M. EGGLESTON, et al.,**
**Plaintiffs,**

v.

**The STATE OF COLORADO, et**
**al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**$1,508,440.00 IN UNITED STATES**
**CURRENCY, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**TWELVE GOLD BARS, Defendants.**

Civ. A. No. 82–K–2144, 82–K–2228
and 83–K–403.

United States District Court,
D. Colorado.

May 30, 1986.

Michael Abramovitz, and Nina Iwashko, Michael Canges, Denver, Colo., for Eggleston and the Albert C. Levy Irrevocable Trust.

Joseph Saint-Veltri, Denver, Colo., for Albert Levy.

Larry Williams, Asst. Atty. Gen., Denver, Colo., for State of Colo. Dept. of Revenue.

James Peters, James Sell, Dist. Attys., Littleton, Colo., for State of Colo.

F. Joseph Mackey, Asst. U.S. Atty., Denver, Colo., for U.S.A.

Jan Michael Zavislan, Rothgerber, Appel, Powers & Johnson, Denver, Colo., for Jefferson Bank & Trust.

E. Hil Margolin, Denver, Colo., for City of Lakewood.

Rod W. Snow, Dixon & Snow, Denver, Colo., for claimant Victoria Levy.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This *in rem* proceeding is comprised of three separate cases which have been consolidated. The parties in this action are: Peter Eggleston, trustee for the Albert C. Levy Irrevocable Trust; Victoria Levy; Albert Levy; the State of Colorado, by and through the Arapahoe County District Attorney; the City of Lakewood; the Colorado State Department of Revenue; Jefferson Bank & Trust; the United States, Drug Enforcement Administration (DEA); and the Internal Revenue Service (IRS). Each

of these parties claims an interest in, and entitlement to, all or part of the *res* in this case. The *res*, which was seized by Lakewood police from Albert and Victoria Levy's home, consists of 12 one ounce gold bars and approximately $1.5 million plus accrued interest. The parties seek an adjudication of their respective priorities to this property.

In the last few years a discernible shift in the methodology of law enforcement has taken place. Federal, state and local agencies have placed a new emphasis on depriving criminal activity of its largesse. The means used include forfeiture, levy, revocation of licenses, declaration of public nuisances and civil proceedings for injunctions and recoupment. Some of these means have existed for a considerable time; others are innovative. While the law of forfeiture is ancient, it has been substantially changed by both federal and state legislation. Most notable among the spate of legislative enactments has been the Comprehensive Crime Control Act of 1984, which includes the Comprehensive Forfeiture Act of 1984. It is generally recognized and admitted that this Act was passed so hastily that the use of the term "comprehensive" in its title is more aspirational than descriptive.

What has yet to be addressed at all by legislation and only fleetingly by case decisions is the horripilating confusion occasioned by different law enforcement agencies pouncing upon the same assets with each claiming the right to drag the spoils of this war on crime to its own lair. Simply stated, there is no legislation which sets priorities for these conflicting claims. The case before me requires that I determine such priorities in the absence of guidance or controlling precedent. I make no pretense of presenting a definitive solution to the problem. I suggest only that this opinion is an effort to fill this lacuna in the structure of the law. I am certain, however, that legislation alone will provide a satisfactory solution to future cases which are certain to follow.

The parties have stipulated to the relevant facts and trial has been waived. Briefs have been submitted and read. Oral arguments were heard on May 12, 1986. Before I consider the parties' arguments and the applicable law, I shall set forth the facts necessary for decision in this case.

## I. FACTUAL BACKGROUND

The stipulated facts, which are contained in the third amended pre-trial order, are as follows:

On November 25, 1981, Lakewood Police Officer Worsham stopped a Porsche on West Colfax Avenue for a traffic violation. The occupants, Douglas Keiser and Carlos Smith, were arrested for possession of cocaine found in the car. While processing Keiser and Smith at the police station, Lakewood Police Officer Shupe copied the contents of an address book and certain other papers found in the men's possession because they contained notations and telephone numbers which aroused suspicion. The copies were given to Agent LaBelle who ran checks on the names listed. Agent LaBelle discovered that several of the persons listed had been arrested or convicted of drug-related offenses.

In May, 1982, Smith agreed to become an informant for Agent LaBelle. Based on information provided by Smith regarding a drug distribution organization, pen register devices were installed on the telephone lines at Keiser's residence in Conifer, Colorado. That installation was authorized by a Jefferson County court order entered June 1, 1982.

During the second week of June, 1982, additional county court orders were issued for the installation of pen register devices on telephone numbers at the residence of Lawrence Levy (son of Victoria and Albert Levy) in Conifer. Also, during June, 1982, the DEA served administrative subpoenas on the telephone company and obtained telephone toll records for the Keiser and Levy phones.

On November 16, 1982, listening devices were placed in Albert and Victoria Levy's home in Aurora, Colorado, pursuant to an

Arapahoe County district court order. Four days later, based upon information gathered by these devices, Lakewood police obtained a search warrant for the Levy home. On November 21, 1982, Lakewood police executed the warrant, seizing approximately $1.5 million in currency from a safe and a suitcase and 12 one ounce gold bars. This property was the product of an illegal exchange for purchase of cocaine. Albert and Victoria Levy were arrested.

On December 1, 1982, Albert Levy created an irrevocable trust for the purpose of paying federal income taxes. Levy transferred his interest in the monies seized to the trust. The IRS was designated as the principal beneficiary and Peter Eggleston was appointed as trustee.

On December 2, 1982, the State of Colorado, by and through the Arapahoe County district attorney, commenced a nuisance action in the Arapahoe County district court, pursuant to Colo.Rev.Stat. §§ 16–13–303(1)(c), 16–13–303(3)(a)–(c), for forfeiture of the monies.[1]

Four days later, Jefferson Bank & Trust brought an action in the state court in Arapahoe County against Albert Levy for an unsecured debt owed by Levy to the bank. The bank obtained and served pre-judgment writs of attachment on the sher-

iffs of Arapahoe, Jefferson, and Denver counties, seeking to attach the seized monies. The bank also served pre-judgment writs of garnishment upon the Lakewood Department of Public Safety, the sheriffs of Arapahoe and Jefferson counties, and the DEA.

On December 15, 1982, Eggleston and Levy filed an action in this court (No. 82–K–2144) against the State of Colorado, the City of Aurora, the City of Lakewood, and several John Does, seeking declaratory relief, an injunction restraining the state nuisance action, and damages for alleged civil rights violations. The complaint in this action was later amended to include the United States and the IRS as defendants.[2]

The next day, December 16, 1982, the Arapahoe County district court judge presiding over the state nuisance proceeding ordered the Lakewood Department of Public Safety to relinquish custody of the seized monies to Eileen Manning, clerk of the Arapahoe County district court. The court further ordered, with the parties' express consent, that the monies be deposited in an interest-bearing bank account. Manning received the monies and deposited them in the United Bank of Littleton. A certificate of deposit was issued to Manning.

---

1. Colo.Rev.Stat. § 16–13–303(3)(a)–(c) provides:
   (3) The following shall be deemed class 1 public nuisances and be subject to forfeiture and distributed as provided in section 16–13–311(3), and no property rights shall exist in them:
   (a) All currency, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for any of the acts listed in subsection (1) of this section; or
   (b) All proceeds traceable to the unlawful activities listed in subsection (1) of this section; or
   (c) All currency, negotiable instruments, and securities used or intended to be used to facilitate any of the violations listed in subsection (1) of this section.
   Section 16–13–303(1)(c) lists the unlawful sale or distribution of controlled substances as one of the acts to which forfeiture applies.

2. Many of Eggleston's and Albert Levy's claims have been settled, dismissed, or abandoned.

The City of Aurora was dismissed from this action on March 18, 1983. *See Eggleston v. State of Colorado*, No. 82–K–2144 (D.Colo. March 18, 1983) (Order of Dismissal). Plaintiffs' claims for civil rights violations were settled and dismissed as against the state on October 24, 1983. Additionally, at oral argument on May 12, 1986, plaintiffs abandoned any remaining civil rights claims. The only claims remaining are for declaratory relief. Plaintiffs seek orders determining the rights of all parties to the *res* and declaring: 1) an evidence of indebtedness, such as a certificate of deposit, is not subject to forfeiture; 2) Colo.Rev.Stat. §§ 16–13–301 *et seq.* are unconstitutional; 3) Levy had a property interest in the monies; 4) this interest was transferred to the trust; 5) the IRS has a beneficial interest in the monies; 6) 21 U.S.C. § 881 is unconstitutional; and 7) forfeiture in this case would constitute an excessive fine in violation of the Eighth Amendment. Because I find that the IRS and the Colorado Department of Revenue are entitled to the *res* in this case, I need not address most of these requests.

On December 22, 1982, pursuant to Colo. Rev.Stat. §§ 39–26–118(2)(a) and 39–22–602, the Colorado Department of Revenue prepared sales, income, and RTD tax assessments against Albert Levy. The department issued jeopardy assessments pursuant to Colo.Rev.Stat. § 39–21–111 and warrants for distraint pursuant to Colo. Rev.Stat. § 39–21–114. On December 23, 1982, a notice of lien for state taxes was filed with the Clerk and Recorder of Arapahoe County. A warrant for distraint was filed with the clerk of the Arapahoe County district court, who entered it into the judgment docket. The clerk then issued a transcript of judgment docket which was sent to the Clerk and Recorder of Arapahoe County. The department served notices of tax lien and garnishment under distraint for collection upon the Arapahoe County district court clerk. Judgment in favor of the department was entered on December 23, 1982 as follows: Colorado sales tax—$115,880.12, RTD sales tax—$19,313.39, and income tax—$58,677.00. These assessments remain unpaid.

Also on December 23, 1982, the United States filed a complaint in this court (No. 82–K–2228) for forfeiture of the monies pursuant to 21 U.S.C. § 881(a)(6) and applied to the court clerk for a warrant for arrest of the currency.

On January 3, 1983, Judge Carrigan, who was presiding over this action at the time, ordered: 1) the warrant for arrest of the defendant currency be issued, 2) the United States Marshal arrest the defendant currency, 3) Manning be appointed as substitute custodian of the currency, 4) the marshal transfer custody from himself to Manning as substitute custodian, 5) publication of notice be made by the marshal, and 6) the complaint and warrant of arrest be served on the Arapahoe County district court clerk.

On January 4, 1983, the notice of arrest and seizure by the marshal was issued and the marshal returned the receipt of service of process on Manning. Also, the United Bank of Littleton issued a receipt to the marshal for storage of the currency.

On January 5, 1983, the IRS terminated Albert Levy's taxable period for 1982 and assessed a tax liability of $1,962,563.00. The IRS served a notice of levy on the Arapahoe County district court clerk, requesting all property and rights to property of Albert Levy in order to satisfy the income tax assessment. Notices of the federal tax lien were filed with the Clerks and Recorders of Pitkin and Jefferson counties on January 24, 1983, and Arapahoe County on January 25, 1983. A notice of final demand was served on the Arapahoe County district court clerk on March 24, 1983.

Beginning on January 11, 1983, and continuing on January 18th and 25th, notice of the arrest and seizure of the currency was published in the Rocky Mountain News. On January 14, 1983, the state nuisance action was dismissed. This action was, however, refiled on January 26, 1983.

On March 11, 1983, the United States filed a complaint in this court (No. 83–K–403) for forfeiture of the gold pursuant to 21 U.S.C. § 881(a)(6). On March 14, 1983, a warrant for arrest of the gold bars was issued. On March 15, 1983, I entered judgment in favor of the IRS sustaining its termination assessment. The assessment of $1,962,563.00 remains unpaid.

On March 22, 1983, I appointed the IRS as receiver of the monies and consolidated the three actions. On March 25, 1983, I issued an order appointing the United States district court clerk as superseding custodian. On April 4, Manning tendered the certificates of deposit to the United States Marshal, who took custody. The next day, the marshal relinquished custody of certificate to James Manspeaker, Clerk of the U.S. District Court.

On April 6, 1983, the marshal arrested the gold bars. Notice of the arrest and seizure of the gold bars was published in the Rocky Mountain News on May 13, 17, and 20, 1983.

On January 26, 1984, Albert Levy pled guilty before Judge Matsch to one count of 18 U.S.C. § 371, conspiracy to defraud the United States by evading and defeating the

collection of taxes by the IRS for income derived from the illegal distribution of cocaine. Criminal charges against Victoria Levy were dismissed on February 9, 1984.

On April 3, 1984, a stipulation, confession of judgment and order of judgment was entered in the Arapahoe County district court against Albert Levy and in favor of Jefferson Bank & Trust in the amount of $373,243.76 plus interest. Levy assigned to the bank, to the extent of the judgment, his interest in the trust.

On May 4, 1984, the government amended its complaint for forfeiture to include alternative claims by the IRS. Under these claims, in the event the monies are not forfeited to the United States, the IRS seeks foreclosure of the federal tax lien.

On May 29, 1984, the state nuisance action in the Arapahoe County district court was again dismissed upon motions by Albert and Victoria Levy.

With these facts in mind, I now turn to the parties' claims and the determination of their priorities.

## II. CLAIMS

The parties' general claims to the *res* follow:

Albert Levy and Peter Eggleston argue the Albert C. Levy Irrevocable Trust has priority to the monies which should be paid to the IRS, as the principal beneficiary of the trust, in satisfaction of Levy's income tax liability.

Victoria Levy asserts the federal income taxes should be paid and, as a matter of equity, any remaining balance should be returned to her.

Jefferson Bank & Trust claims priority to the fund on two bases. First, the bank claims a derivative interest to the currency through the trust by virtue of an assignment of Levy's interest in and to the trust on April 3, 1984. Second, the bank claims a lien against the monies based on its pre-judgment writs of attachment and garnishment.

The Colorado Department of Revenue maintains a portion of the currency found in the Levys' residence was collected, or should have been collected, as state sales tax and remitted to the state at the moment of the sale of the drugs. According to the department, the amount for sales tax became public monies at the time of the sale of the drugs and Levy was a trustee for the state with respect to these monies. Regarding the state income tax owed by Albert Levy, the department contends its lien has priority.

The State of Colorado asserts the monies constitute a class I nuisance under the Colorado public nuisance statutes, Colo.Rev. Stat. §§ 16–13–301 *et seq.* and, thus, the state is entitled to forfeiture of the monies. In the alternative, the state requests reimbursement of $42,593.78 for the costs of its investigation.

The City of Lakewood's claim is derivative in nature. Lakewood requests reimbursement of the costs of its investigation if the state nuisance or the DEA's forfeiture claim is given priority.

The federal government maintains the DEA's claim for federal forfeiture under 21 U.S.C. § 881(a)(6) prevails over all other competing interests in the *res*. It is asserted, under § 881, that forfeiture takes place at the moment of illegal use of the *res*. At that instant, all rights and legal title to the property pass to the government.

Finally, the IRS contends, first, the monies should be forfeited to the United States under § 881 because forfeiture takes place at the moment of illegal use and the taxpayer has no rights to which a subsequent federal tax lien can attach. In the alternative, the IRS contends its tax lien prevails over all other claims except that of the Colorado Department of Revenue.

## III. PRIORITIES OF THE PARTIES' CLAIMS

For the reasons stated below, I find the IRS's claim to the currency and the gold bars is superior to all of the other claims in this case except that of the Colorado De-

partment of Revenue for state income tax owed by Albert Levy.

## A. Federal Tax Liens and the IRS's Claim

Broad powers of taxation are granted to Congress by express provisions of the Constitution. *See, e.g.*, U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes ...."); amend. XVI ("The Congress shall have power to lay and collect taxes on incomes, from whatever source derived...."). In order to execute these powers, Congress has authority to enact any necessary laws. *See* U.S. Const. art. I, § 8, cl. 18. Needless to say, this authority has been exercised on many occasions. The Internal Revenue Code of 1954, 26 U.S.C. § 1 *et. seq.*, as amended and revised, embodies the statutes for imposition and collection of taxes.

The Secretary of the Treasury and the IRS are charged with the duty of collecting taxes. 26 U.S.C. § 6301. Ordinarily, assessments of tax liability and notice and demand are not required for collection of taxes. *See* 26 U.S.C. § 6151(a). Where, however, the Secretary finds the collection of taxes is jeopardized by an act of the taxpayer, the Secretary must "immediately make a determination of tax for the current taxable year ... [and] assess the amount of the tax so determined...." 26 U.S.C. § 6851(a)(1). Once this assessment is made, "notice of such determination and assessment ..., together with a demand for immediate payment of ... [the] tax," must be given to the taxpayer. *Id.*

If the taxpayer refuses or fails to pay the tax after demand for payment has been given, a federal tax lien arises in favor of the government for the amount of the tax upon all of the taxpayer's real and personal property or rights to such property. 26 U.S.C. § 6321. This lien arises, by operation of law, at the time the assessment is made and it continues until the tax liability is satisfied or it becomes unenforceable by reason of lapse of time. 26 U.S.C. § 6322.

In the instant case, the IRS received information that Albert Levy intended to leave the country and to remove or conceal his assets so as to place them beyond the reach of the government. Accordingly, on January 5, 1983, the IRS terminated Levy's 1982 taxable year as of November 30, 1982, and assessed a tax liability of $1,962,-563.00. Notice of this termination assessment and demand for payment were given to Levy. To date, Levy has failed or refused to pay this amount.

On March 14, 1983, I upheld the termination assessment, ruling that it was reasonable under the circumstances. At that time, I did not explicitly address the validity of the tax lien which arose from the assessment. I now find, however, that the requirements for such a lien have been met and, as of January 5, 1983, a federal tax lien arose in favor of all of Levy's real and personal property and rights to property. 26 U.S.C. § 6321.

The initial question in determining the priority of a federal tax lien with respect to certain property is whether the lien has attached to that property. If the taxpayer has no interest in or title to the subject property, the tax lien cannot attach and priority cannot be given to the lien. *See* 26 U.S.C. § 6321. State law determines the extent of a taxpayer's interest in property to which a federal tax lien can attach. *See Aquilino v. United States*, 363 U.S. 509, 512–13, 80 S.Ct. 1277, 1279–80, 4 L.Ed.2d 1365 (1960).

On the other hand, federal law determines priority as between a federal tax lien and other competing claims against the taxpayer's property or rights to property. *Id.* at 513–14, 80 S.Ct. at 1280–81; *see also Allan v. Diamond T Motor Car Co.*, 291 F.2d 115, 117 (10th Cir.1961). Generally, under federal law, federal tax liens prevail over all claims to the taxpayer's property except those which have been perfected or become choate before the tax lien attaches. Thus, once it has been determined that the taxpayer has rights to the subject property to which the tax lien has attached, it must be ascertained whether the competing

claims were choate in order to affix priorities. An interest or lien in the property becomes choate "when the identity of the lienor, the property subject to the lien, and the amount of the lien are established." *United States v. New Britain,* 347 U.S. 81, 84, 74 S.Ct. 367, 369, 98 L.Ed. 520 (1954); *see also United States v. L.R. Foy Construction Co., Inc.,* 300 F.2d 207, 210–11 (10th Cir.1962).

Next, the order in which the liens attach to the subject property and become perfected must be determined because, in general, "the first in time is the first in right." *See New Britain,* 347 U.S. 81, 85, 74 S.Ct. 367, 370; *Southwest Engine Co. v. United States,* 275 F.2d 106, 107 (10th Cir.1960).[3] Thus, if the federal tax lien arises and attaches to the taxpayer's property before a claimant's lien has become choate, the tax lien prevails.

With these principles and facts in mind, I now turn to a consideration of each of the parties' claims in this case and its priority *vis a vis* that of the federal tax lien.

### B. The State of Colorado's Claim

The state argues, first, that the tax lien could not attach to the currency and the gold bars because Albert Levy had no interest in or title to this property on January 5, 1983. According to the state, under Colorado law, a person loses all legal rights to property once it is seized pursuant to the Colorado public nuisance statutes. Thus, the state asserts: 1) Albert Levy was divested of title to the *res* at the moment it was seized by the state; 2) the IRS tax lien could not attach to this property since it did not belong to Levy; and 3) the IRS therefore has no priority to the currency and the gold bars in this case.

The issues raised by the state have been presented to this court before in two cases and are currently the subject of an appeal

before the Tenth Circuit. In the first case, *United States v. Wilkinson,* 628 F.Supp. 29; the IRS learned that the Boulder County sheriff's department had seized property, including currency, precious gems, and narcotics, from the home of Gerald Wilkinson on June 11, 1980. The following day, the County of Boulder filed a nuisance action in the Boulder County district court seeking forfeiture of the seized property. On June 18, 1980, the IRS made a termination assessment against Wilkinson. Notice of the federal tax lien which arose from this assessment was filed with the Clerk and Recorder of Boulder County on June 19, 1980. On October 14, 1980, the Boulder County district court entered an order *nunc pro tunc* to the date of seizure, forfeiting the property to Boulder County as of that date. The IRS then filed an action in this court seeking to foreclose the federal tax lien. Judge Carrigan, who presided in that case, recognized that a controlling question was whether, after the date of seizure, Wilkinson retained any property rights in the items seized to which the tax lien could attach. Finding no direction on this issue in the statutes or in Colorado case law, Judge Carrigan certified the question to the Colorado Supreme Court.

On August 27, 1984, the Colorado Supreme Court ruled on the question certified, holding that "[n]o property interest is retained by a person subsequent to the seizure of property but prior to a final judicial determination [that the property is forfeited]." *In re Interrogatories of the U.S. District Court: United States v. Wilkinson,* 686 P.2d 790, 794 (Colo.1984). In arriving at this decision, the court deduced an intent by the state legislature to divest the property owner of all legal title as of the date of seizure from the legislature's stated policy that "every public nuisance shall be restrained, prevented, abated, and

---

**3.** Congress has provided statutory protections to certain specifically designated, later perfected creditors competing with federal tax liens which modify the "first in time, first in right" rule. Under 26 U.S.C. § 6323, federal tax liens are invalid as against any purchaser, holder of a

security interest, mechanic's lienor, or judgment lien creditor, but only until notice of the lien is filed in accordance with 26 U.S.C. § 6323 and relevant state law, the tax lien has priority over all claims perfected thereafter.

perpetually enjoined." Colo.Rev.Stat. § 16–13–302. In what was understandably an exercise in eisegesis, the court reasoned unless the property owner was divested of all legal right to the property after it was seized, the property could be transferred to the benefit of the owner and the forfeiture action would be frustrated. *Id.* at 792–93.

The court also applied a legal fiction commonly referred to as the "relation back doctrine" in reaching its conclusion that property rights are forfeited at the time of seizure. *Id.* at 793–94. This doctrine, which is often applied to forfeiture statutes, was first clearly set forth in *United States v. Stowell*, 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555 (1890). There, the United States Supreme Court stated:

> Whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time the offense is committed, and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith.

*Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 247 (emphasis added).

Applying this doctrine to forfeitures under the Colorado public nuisance statutes, the court held that "a final forfeiture order pursuant to section 16–13–309 relates back to the date of seizure of the property." *In re Interrogatories*, 686 P.2d 790, 794. Thus, according to the Colorado Supreme Court, once property is seized pursuant to the public nuisance statutes, the owner is divested of all legal title and, upon a final order of forfeiture, the governmental entity's right to the property relates back to the date that the property was seized.

Based on this decision, Judge Carrigan ruled against the IRS, holding that "Wilkinson's property rights ended on ... the date of the seizure." *United States v. Wilkinson*, 628 F.Supp. 29 (D.Colo.1985) (Order). This case is presently on appeal before the Tenth Circuit.

The second case in this district which raised the same issues of divestiture of property rights upon seizure and the governmental entity's right to the seized property was *United States v. Wingfield*, No. 82–CR–264. In that case, the defendant was arrested at his home in Boulder for unlawful flight to avoid prosecution. At the time of the arrest, a Boulder police officer observed marijuana in Wingfield's residence. A search warrant was obtained and, in the course of a search of the house, Boulder police seized narcotics, currency, and silver bars. Three days later, on November 8, 1982, a nuisance action was filed in Boulder County district court. On January 13, 1983, the IRS made a termination assessment against Wingfield for federal income taxes. Notice of the lien which arose from this assessment was filed on January 19, 1983. On May 17, 1983, the state court entered an order effective *nunc pro tunc* to the date of seizure, holding, *inter alia*, that the property was forfeited to the county.

Meanwhile, Wingfield was convicted on federal criminal charges on February 11, 1983. On September 1, 1983, after various conflicting claims to the property had been asserted, I ordered the funds be deposited with the United States District Court Clerk. At a hearing regarding these claims on August 20, 1984, I ruled as follows:

> The principal responsibility of the Internal Revenue Service is to enforce the collection of taxes and see to their deposit in the public fisc. It is not authorized by the Congress of the United States to relax its vigilance or, out of some notion of cooperation with local law enforcement agencies, to subvert its principal responsibility of collecting taxes because of some secondary gain which might be obtained in terms of cooperation with law enforcement, and I think I should make it very clear that where federal taxes are due, particularly where they are due as

the result of obtaining monies or profits from a criminal enterprise, that the United States government is not free to waive its rights to funds or to act in such a manner as to become junior to a state agency or municipality acting under a state statute. State statute[s] cannot subvert the primary authority of the federal government to collect its taxes under these circumstances.

Therefore, the Clerk of the Court is ordered to honor and satisfy the claim of the Internal Revenue Service. If there are any proceeds left over, the remainder of the funds shall be used to satisfy or partially satisfy the junior and inferior claim of the County of Boulder. The claimant Wingfield is not entitled to any of the funds. The funds which the IRS collects are justified as payment of the taxes due by Wingfield and, therefore, shall be applied to that particular amount.

*United States v. Wingfield,* No. 82–CR–264, transcript of hearing at 13–14 (D.Colo. August 20, 1984); *see also United States v. Wingfield,* No. 82–CR–264 (D.Colo. August 28, 1984) (Order).

Boulder County has appealed this decision. The county asserts in its briefs before the Tenth Circuit, based on the Colorado Supreme Court's decision in *In re Interrogatories,* that Wingfield was divested of his rights to the property at the time of seizure and, thus, the federal tax lien could not attach to the property. Oral arguments were heard in May, 1985 but the Tenth Circuit has yet to render its decision in that case.

The issues presented in both *Wilkinson* and *Wingfield* are identical to those in the instant case. I recognize state law determines a taxpayer's interest in the subject property and, under *In re Interrogatories,* a person is divested of legal title to the property at the time of seizure. This does not mean, however, that Albert Levy had no property interest in the *res* to which the tax lien could attach. Rather, I find the state's argument that the tax lien did not attach to the property because it did not

belong to Levy and, therefore, the tax lien has no priority to the *res* must fail for three reasons.

■ First, under *In re Interrogatories,* a person is divested of title to property "subsequent to ... [its] seizure ... but prior to a final judicial determination." 686 P.2d 790, 794. Clearly, it cannot be said that the owner loses all rights to, for example, currency at the moment it is seized where there is no final judicial determination that the currency was used in connection with a drug transaction and, therefore, constituted a public nuisance, or where a court declines to condemn the property on the ground that the currency was not used in the sale or purchase of narcotics. Either result would contravene due process. More appropriately, until the property is declared forfeit, the governmental entity seeking forfeiture has an interest in the property and the owner retains legal title even though he may not have the right to possess the property. If forfeiture is later declared, the governmental entity's interest is perfected and the owner is deemed divested of the property as of the date it was seized pursuant to the nuisance statutes. Thus, a person is divested of title to property at the time of seizure but only if there is a subsequent judgment of forfeiture.

■ In the present case, there has been no final determination of forfeiture under the Colorado public nuisance statutes. The state nuisance action was dismissed on January 14, 1983, refiled on January 26, 1983, and dismissed again on May 29, 1984. Since there has been no judgment of forfeiture, I find that Albert Levy was not divested of his legal right to the property which is the subject of this action and the federal tax lien attached to that property.

■ Second, the state's argument overlooks the well-established doctrine of choateness. As stated above, a federal tax lien is junior only to a competing claim that was choate before the lien attached to the *res* in dispute. *See United States v. Pioneer American Insurance Co.,* 374 U.S. 84, 88, 83 S.Ct. 1651, 1655, 10 L.Ed.2d 770

(1963); *New Britain*, 347 U.S. 81, 86, 74 S.Ct. at 370–71. In the instant case, it is clear that the state's right to the *res* has not been established or perfected by a final judgment of forfeiture. Thus, the state's claim was not choate at the time the IRS's lien arose and attached to the *res*.

Further, the state's position "ignores the effect of a lien for federal taxes under the supremacy clause of the Constitution." *Michigan v. United States*, 317 U.S. 338, 340, 63 S.Ct. 302, 303, 87 L.Ed. 312 (1943). As the United States Supreme Court stated in *United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983), a federal tax lien is one of the "formidable arsenal of collection tools," essential "to ensure the prompt and certain enforcement of the tax laws in a system relying primarily on self-reporting." *See also G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350, 97 S.Ct. 619, 627, 50 L.Ed.2d 530 (1977); *Matter of Carlson*, 580 F.2d 1365, 1368 (10th Cir.1978). "The establishment of a tax lien by Congress is an exercise of its constitutional power 'to lay and collect taxes.'" *Michigan*, 317 U.S. 338, 340, 63 S.Ct. 302, 303. Application of the relation back doctrine cannot be held to subvert that constitutional power. While this legal fiction may merge a later judgment into an earlier attachment under state law, thus according a prevailing party priority over intervening creditors or claimants, it cannot affect or impair the priority of a federal tax lien under established principles of choateness and long-standing congressional declaration of policy. *See, e.g., United States v. Wadill, Holland & Flinn, Inc.*, 323 U.S. 353, 357, 65 S.Ct. 304, 306–07, 89 L.Ed. 294 (1945); *Rodriguez v. Escabrom Development Corp.*, 740 F.2d 92, 98 (1st Cir.1984);

see also *United States v. Acri*, 348 U.S. 211, 213–14, 75 S.Ct. 239, 241, 99 L.Ed. 264 (1955); *United States v. Security Trust and Savings Bank*, 340 U.S. 47, 50, 71 S.Ct. 111, 113, 95 L.Ed. 53 (1950). The reason for this is readily apparent. If state courts and legislatures could, by invocation of the relation back doctrine, give third parties priority over federal tax liens, those liens would be rendered nugatory at will. *See, e.g., New Britain*, 347 U.S. 81, 86, 74 S.Ct. at 370–71. Such a practice would destroy the meaning of the supremacy clause and severely affect the constitutional authority and ability of the federal government to collect revenue.[4]

For these reasons, I find: 1) Albert Levy was not divested of title to the currency and the gold bars at the time they were seized, 2) Levy had an interest in the property to which the federal tax lien attached on January 5, 1983, 3) the state's claim for forfeiture was not established and was not choate at the time the federal tax lien arose, and 4) the IRS has priority over the state to the *res* in this case.

## C. The DEA's Claim

The DEA's assertion that it is entitled to first priority and forfeiture of the *res* in this case is also without merit. When § 881 was originally enacted, Congress failed to provide any guidance as to when property used in drug transactions was forfeited to the government and, thus, at what point the government's interest would have priority.[5] To fill this void in the statute, courts applied the relation back doctrine. *See Western Pacific Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1287 (9th Cir.1984); *United States v. $84,000.00 in United States Currency*, 717 F.2d 1090,

---

4. Additionally, I question the basis for the Colorado Supreme Court's ruling in *In re Interrogatories*. As will be discussed more fully below, the relation back doctrine applies only to mandatory forfeiture statutes. The Colorado nuisance statutes are permissive in that they state that certain items of property "are subject to seizure, confiscation and forfeiture...." *See* Colo.Rev.Stat. § 16–13–303(2). Thus, the relation back doctrine is not properly applied to

forfeitures under the Colorado public nuisance statutes.

5. Recently, Congress rectified this failure by enacting 21 U.S.C. § 881(h) which provides: "All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section."

1101–02 (7th Cir.1983), *cert. den. sub. nom. Holmes v. United States,* —— U.S. ——, 105 S.Ct. 131, 83 L.Ed.2d 71 (1984); *O'Reilly v. United States,* 486 F.2d 208, 210 (8th Cir.1973), *cert. den.,* 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973); *United States v. One Piece of Real Estate,* 571 F.Supp. 723, 725 (W.D.Tex.1983); *United States v. One 1975 Chevrolet K–5 Blazer,* 495 F.Supp. 737, 744 (W.D.Mich.1980); *see also United States v. One 56–Foot Yacht Named Tahuna,* 702 F.2d 1276, 1279 (9th Cir.1983).

■■■■■ In applying this doctrine, however, these courts failed to consider the doctrine's distinction between mandatory and permissive forfeiture statutes. Under *Stowell,* this legal fiction applies only where the statute in question mandatorily requires that upon the commission of a specified act, property "shall be forfeited." Unlike the mandatory forfeiture statute at issue in *Stowell,* § 881 is permissive because it states that, upon the commission of a specified act, property is only "subject to forfeiture." Since § 881 is a permissive forfeiture statute, the relation back doctrine has no application. *See United States v. Thirteen Thousand Dollars in United States Currency,* 733 F.2d 581, 584 (8th Cir.1984) (the relation back doctrine is inapplicable to § 881 forfeitures); *see also United States v. Currency Totalling $48,-318.08,* 609 F.2d 210, 212–13 (5th Cir.1980) (the relation back doctrine does not apply where the statute provides only for a possibility of subsequent forfeiture). Accordingly, the DEA's interest in the *res* in this case can vest only upon a judgment in favor of the government for forfeiture. Such a judgment has not been rendered in this case. The federal tax lien therefore has priority under the doctrine of choateness.

---

**6.** I find the department took all of the steps required to perfect its liens.

**7.** Colo.Rev.Stat. § 39–22–104(1) states: "A tax determined in accordance with the rates set forth in subsection (2) of this section is imposed for each taxable year on the Colorado taxable income of every individual, estate, and trust."

## D. The Colorado Department of Revenue's Claim

■■■■■ With respect to the Colorado Department of Revenue's claim to the currency and the gold bars, I must determine whether the liens for state sales, RTD, and income taxes are valid before I can consider the relative priority of these liens.[6] It has been stipulated that Albert Levy sold cocaine, receiving the currency and gold bars as payment. Under Colorado law, state sales and RTD taxes can be imposed on this drug sale only if it is construed as a retail, rather than as a wholesale, transaction. *See* Colo.Rev.Stat. § 39–26–104(1)(a). The department has offered no evidence which would indicate that this drug sale was anything other than a wholesale transaction. Accordingly, I find that state sales and RTD taxes may not be levied on this sale and, thus, the liens for such taxes are invalid. On the other hand, I find that state income tax may be levied on the profit or gain realized from this sale since income derived from any source is taxable under state law[7] and, thus, the lien for state income taxes is valid.

■■■■ Further, I find that this lien for income taxes has priority over the federal tax lien. Under Colo.Rev.Stat. § 39–21–114(4), filing of a notice of lien for state taxes "with the person in possession of any personal property or rights to property belonging to the taxpayer, ... operate[s] as a lien upon such personal property or rights to property from the date of such filing." On December 23, 1982, the department served a notice of lien for state taxes upon the Arapahoe County district court clerk who, at that time, had custody of the certificate of deposit. As of that date, the department's lien was choate since the identity of the lienor, the amount of the lien for

Taxable income, as an undefined term, has the same meaning as used in the federal tax code. Colo.Rev.Stat. § 39–22–103(13). Under federal law, taxable income is derived from gross income which means "all income from whatever source derived...." 26 U.S.C. § 61(a); *see also* 26 U.S.C. §§ 62–64.

state income tax, and the property to which the lien attached were established. Because this lien pre-dates that of the IRS, it has priority under federal law.

### E. Jefferson Bank & Trust's Claim

Jefferson Bank & Trust has made two separate claims to the *res* in this case. First, the bank claims a derivative interest by virtue of an assignment of Albert Levy's interest in the trust, which assignment was part of a settlement agreement between those parties on April 3, 1984. Second, the bank claims a lien against the *res* based on its pre-judgment writs of attachment and garnishment which were served on December 6, 1982. Neither of these claims has priority over the federal tax lien. Any interest which the bank obtained by assignment on April 3, 1984 would be burdened by the earlier tax lien. *See, e.g., United States v. Bess,* 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958) (property which is transferred after the attachment of a federal tax lien remains burdened by the lien); *Michigan,* 317 U.S. 338, 340, 63 S.Ct. at 303. Additionally, since the bank did not obtain a confession of judgment against Levy until April, 1984, its claim based on the judgment was inchoate at the time the federal tax lien arose and the notices of the tax lien were filed. *See United States v. Liverpool & London & Globe Insurance Co., Ltd.,* 348 U.S. 215, 217, 75 S.Ct. 247, 248, 99 L.Ed. 268 (1955) (pre-judgment writ of garnishment inchoate as to later obtained federal tax assessment and filing of notice of federal tax lien where judgment was obtained after assessment and filing of lien); *United States v. Acri,* 348 U.S. 211, 214, 75 S.Ct. 239, 241, 99 L.Ed. 264 (1955) (attachment lien was inchoate because, at the time the attachment lien issued, the fact and the amount of the lien were contingent upon later judgment); *Security Trust & Savings Bank,* 340 U.S. 47, 50, 71 S.Ct. 111, 113, 95 L.Ed. 53. Accordingly, I find that the federal tax lien in this case has priority over both of the bank's claims to the *res.*

### F. Victoria Levy's Claim

I need not address Victoria Levy's claim to the currency and the gold bars *vis a vis* the IRS's claim because Victoria Levy does not assert any priority over the federal tax lien. Indeed, she asserts that the federal income taxes should be paid.

### G. City of Lakewood's Claim

Similarly, I need not address the city's claim for reimbursement of investigation costs because I find that neither the DEA nor the state has priority over the IRS to the *res.*

### H. Albert Levy's and Eggleston's Claim

Regarding Albert Levy's and Eggleston's claim to the currency and the gold bars, it is asserted by the state that the trust is a nullity since Levy had no property interest in the *res* to convey to the trust at the time it was created. As discussed above, I find that Levy did have title to the property at that time. Under the circumstances of this case, seizure of the *res* did not divest Levy of title. I find, however, that the trust is void on other grounds and, thus, is not entitled to the priority claimed by Levy and Eggleston.

To begin with, assuming, but not deciding, that the trust may be valid in other respects, I find the trust is unfunded. At the time the trust was created, Albert Levy did not have possession of the currency and the gold bars. Possession has never been in the trustee nor, under the decision in this case, will the trustee ever possess the *res.* Additionally, enforcement of this alleged trust would be against public policy, even though its performance would not be illegal. *See* Restatement (2d) of Trusts § 62. Levy's clear intent in creating this trust was to hinder or defeat all other claims in creating this trust except that of the IRS so that the currency and gold bars could be used to satisfy his enormous tax liability. I recognize that an assignment for the benefit of certain creditors is permissible under Colorado law. *See Farmers Acceptance Corp. v. De Lozier,* 178 Colo. 291, 496 P.2d 1016 (Colo.1972).

Under the circumstances of this case, however, Levy's motive was improper and cannot be condoned. Accordingly, I find that Levy's and Eggleston's claim to the *res* is without merit and the federal tax lien prevails over this claim.

IT IS THEREFORE ORDERED THAT:

1. The Colorado Department of Revenue's lien for state income taxes has priority to the *res* and shall be satisfied in full. The remainder of the *res* shall be applied to the debt owed by Levy for federal income taxes in partial satisfaction of the amount of the tax lien. All other claims are denied.